**George James PLATSIS, Plaintiff,**

v.

**E.F. HUTTON & COMPANY INC., Defendant.**

**No. G83–784 CA(5).**

United States District Court, W.D. Michigan, S.D.

Aug. 4, 1986.

George J. Platsis, Okemos, Mich., pro se.

Warner, Norcross & Judd by William K. Holmes, Grand Rapids, Mich., Kutak Rock & Campbell by Lindsey Miller-Lerman, Omaha, Neb., for defendant.

## OPINION

HILLMAN, Chief Judge.

### BACKGROUND

The plaintiff in this action, George Platsis, age 47, is an educated and intelligent man, having graduated from the University of Michigan Law School. Prior to entering law school, he completed three years of medical school, finishing in the top third of his class. Plaintiff taught physiology to medical students prior to entering law school.

Upon graduation from law school, he was employed at the Federal Trade Commission where, for approximately a year and a half he participated in trial preparation and document production.

Upon leaving the Federal Trade Commission in October, 1969, plaintiff was trial attorney for the Michigan Department of Attorney General, Consumer Protection Division; from January, 1971, until May, 1975, he was a trial attorney for the Department of Transportation, specializing in condemnation and highway negligence defense work.

Plaintiff began solo practice in Michigan in 1975, as a trial attorney specializing in plaintiffs' personal injury, medical malpractice and highway negligence defense and condemnation as a Special Assistant Attorney General. Plaintiff is married to a science and mathematics teacher and has two teenage daughters. He and his family live in Okemos, Michigan.

Prior to 1981, plaintiff had only a small amount of investment experience. He testified to having taken a course in securities law at the Michigan Law School. His investment experience was limited to purchase of mutual funds and apparently a small number of shares in Ford Motor Company securities.

Defendant Hutton is a major brokerage house, licensed by the Securities and Exchange Commission and acts as a sales agent or broker to investors.

Plaintiff's relationship with Hutton commenced in late 1980, when he anticipated the receipt in 1981, of a substantial contingent fee in the amount of approximately $500,000. Although the record is not totally clear concerning his earned income from his law practice, aside from the contingent fee, plaintiff testified that his income before 1981, averaged "about $50,000".

Upon receipt of the lump sum contingent fee, plaintiff sought tax shelter investment advice from Hutton's Lansing, Michigan office. Specifically, plaintiff was interested in investments that would help reduce his tax burden. Plaintiff testified that he thought it was "unfair" that he should be taxed at a high income rate in one year for income received from work performed over a period of at least six years on one case.

Plaintiff established several accounts with Hutton over the course of time, the initial one consisting of a $500,000 deposit on October 23, 1980. On January 30, 1981, plaintiff transferred almost this entire sum to his personal Hutton account.

At the Hutton office in Lansing, plaintiff was introduced to Joseph Potvin as "an expert in tax shelter investments". Mr. Potvin currently an assistant vice-president of Hutton, was then an account executive with considerable training and experience in the area of tax shelter investments. Mr. Potvin, a 1972 graduate of Michigan State University, was then and is now the tax shelter coordinator for the Lansing office. As tax shelter coordinator, Mr. Potvin received extensive training in the tax shelter investments area and was charged with the responsibility of training account executives in the Lansing office. Mr. Potvin had, earlier in his career, worked for Merrill Lynch. Mr. Potvin is a member of the New York Stock Exchange, The American Stock Exchange and the National Association of Security Dealers of America.

Upon their meeting, or shortly thereafter, plaintiff related to Mr. Potvin his financial situation including his current professional corporation income of $500,000. Plaintiff emphasized to Mr. Potvin his desire to mitigate the tax burden he would incur due to the receipt of the contingency fee in one lump sum. Early on in their relationship, Mr. Potvin recommended to plaintiff that he enroll in Hutton's Personal Financial Management (PFM) program. The PFM program involves a comprehensive analysis of a customer's financial and estate situation including investment goals. Plaintiff declined to enroll in the PFM program viewing the $5,000 fee as prohibitive and stating that he thought he could do much of the work himself. Mr. Potvin also recommended that plaintiff seek the advice of a certified public accountant and specifically suggested a Lansing C.P.A. named James Briley, to assist in preparing plaintiff's tax returns. Again, plaintiff declined. It was his belief that he had always prepared his own taxes and again was ap-

parently reluctant to pay anyone else for tax advice.

Prior to contacting Hutton, plaintiff, on his own, had done some oil and gas lease investigation. There was testimony that plaintiff had investigated at least two oil and gas offerings related to developmental wells. Plaintiff decided not to invest in these programs for they lacked the "diversity" that exploratory programs offered. However, plaintiff remained interested in oil and gas and sought to pursue exploratory offerings through Hutton. At one of their early meetings, plaintiff specifically requested information from Mr. Potvin regarding oil and gas investments handled by Hutton. Prior to plaintiff's first investment in an oil and gas program, Mr. Potvin discussed with plaintiff the relative advantages and disadvantages of alternate investments. In particular, plaintiff and Mr. Potvin discussed and compared oil and gas, municipal bonds and real estate limited partnership investments. Plaintiff was provided with a copy of a Hutton brochure entitled, "Understanding Tax Shelters", which describes the tax advantages and risks associated with various tax shelter investments, including cattle, equipment leasing, real estate and oil and gas.

Upon analysis, plaintiff concluded that neither municipal bonds or real estate limited partnership investments suited his particular need for immediate high tax loss write-offs such as those available through investments in oil and gas. Accordingly, plaintiff chose to invest in oil and gas to the relative exclusion of alternate investments with the exception of two real estate tax shelters which are not involved in this action.

Plaintiff purchased interests in the following oil and gas shelter limited partnerships ("Litigated investments") on the dates indicated for the following initial amounts:

| Investment Program | Date of Purchase | Investment Amount |
| --- | --- | --- |
| Forest 81A | 15 Dec 1980 | $10,000 |
| Hilliard 81 | 11 Feb 1981 | 10,000 |
| Indian Wells 1981-I | 2 Feb 1981 | 150,000 |
| Can Am 81-I | 11 Mar 1981 | 10,000 |

| Investment Program | Date of Purchase | Investment Amount |
|---|---|---|
| Woods | 11 Mar 1981 | 10,000 |
| Apache 81–I | 31 Mar 1981 | 5,000 |
| Sanchez–O'Brien 81–I | 9 Jun 1981 | 10,000 |
| Forest 81–B | 9 Jun 1981 | 10,000 |
| Kenai 81–2 | 18 Jun 1981 | 10,000 |
| Woods 81–II | 26 Jun 1981 | 10,000 |
| Woods 82–III | 20 Nov 1982 | 10,000 |
| | | 245,000 |

Plaintiff testified that he read the prospectus which had been issued for each of these investments, although he claims that he read earlier ones more carefully than later ones.

Plaintiff told Mr. Potvin that he wished to be informed of each oil and gas opportunity as it became available. Accordingly, Mr. Potvin sent to plaintiff each of the offering documents when it was "hot off the press" and, invariably several weeks before the purchase date. Plaintiff upon review of the material often decided to invest in these programs and submitted the required paper work to Mr. Potvin days or weeks in advance of the program closing date with instructions to Mr. Potvin to forward the plaintiff's application to the sponsor as late as possible so as to retain and maximize his interest bearing money. Hutton is not a sponsor or general partner of any of the litigated oil and gas Limited Partnerships.

Plaintiff's first investment in oil and gas was made in December of 1980. Mr. Potvin supplied plaintiff with a prospectus for Forest 81–A, a public drilling program. Plaintiff received this prospectus and according to his testimony, read it "cover to cover". Forest 81–A was a first time offering by Forest Oil, the general partner. At the time that plaintiff studied the prospectus, he recognized the fact that there was insufficient information such as a track record to judge the quality of the offering for the likelihood of success. There was conflicting testimony about the conversation and representation made back and forth between Mr. Platsis and Mr. Potvin concerning this Forest Oil investment. The court is satisfied there were no actionable misrepresentations or omissions made by Mr. Potvin prior to plaintiff's invest-

ment in this program. Despite the "deficiency" which plaintiff discovered in the prospectus, he nevertheless chose to invest in Forest 81–A apparently due to his overriding desire for tax write-offs. On June 9, 1981, plaintiff decided to invest in a second Forest program titled Forest 1981–B and subsequently notified Hutton of his decision after it had been made.

After plaintiff had made his initial investment in Forest 81A in the amount of $10,000, but before any additional investments, Mr. Potvin invited plaintiff to attend a seminar at Long's Convention Center in Lansing. This was sponsored by representatives of Can Am Drilling Programs Inc. ("Can Am"), a corporate sponsor and general partner of several oil and gas limited partnerships. This seminar was held either in late December of 1980 or early January of 1981. At the Can Am meeting, plaintiff received a handout prepared by Can Am representatives. The handout included an article in *Forbes* magazine and responses to that article prepared by Hutton and Can Am. The *Forbes* article was entitled: "But Where are the Limited Partners' Yachts?" The article, (offered and received as plaintiff's exhibits 87–88, 571–594) raised concerns regarding oil and gas limited partnership investment returns and included an analysis of prior Can Am programs. Plaintiff testified that he read and understood the article and the issues raised therein.

By this time at least it is clear from the evidence that plaintiff was an intelligent, inquiring, knowledgeable student of oil and gas offerings. He freely admitted that even at this early date he was critical of the offering documents and continued to be critical in the remaining ten investments because they did not include, among other things, rates of return of income to limited partners in prior programs offered by the same sponsor and projections as to the future of the programs about to be formed. Plaintiff concedes he was also aware of and critical of the structure of the program with respect to allocation of risk and reward between the limited partners and the general partners. It was also, at about

this time, in early 1981, plaintiff contacted other non-brokerage sellers of interest in single oil well deals but decided to do all of his investing through Hutton. Plaintiff testified on a number of occasions that he had been impressed with Hutton's advertising that when "Hutton speaks, people listen" and further because of Hutton's reputation concerning its expertise, integrity and stature in the tax shelter industry. Plaintiff was also attracted to Hutton because of Hutton's suitability investigation of each sponsor before each offering was made to investors.

Plaintiff's second investment was in Hilliard 81. Prior to this investment, he insisted that Mr. Potvin provide him with reserve reports from prior programs sponsored by Hilliard Oil and Gas Inc., the partnerships' general partner. From the reserve reports plaintiff concluded that he would be able to calculate the limited partners' rates of return on investment in the prior programs sponsored by Hilliard. Plaintiff requested the reserve reports at least four times prior to his investment in Hilliard 81 and stated he was "frustrated" because of lack of information but nevertheless, made his investment.

Plaintiff thereafter invested in eight more publicly offered oil and gas limited partnerships over the course of a year and a half. It is undisputed that plaintiff received all offering documents prior to investment. As previously indicated, he testified that he read the earlier documents "cover to cover" and perhaps the later ones in less detail. Further, plaintiff acknowledged that these documents concerning each of the programs contained numerous warnings such as the high risks involved in the investments; that an investor should not rely on the past performance of programs of the same sponsor as indicative of the future performance of the current programs; also, that no one was authorized to make oral representations regarding the programs and that an investor should rely solely on the written offering materials in making his investment decisions.

In addition, plaintiff warranted in writing with regard to each program in which he invested that he was making his investment based on the written offering materials alone and was not investing in reliance on any oral communication that may have been made regarding the program. Further, he warranted that he was aware of the specific risks noted in the offering materials and the general risks of losing all his money and/or an unfavorable change in the tax laws with respect to write-offs.

Concerning plaintiff's final investment, made in Woods 82–III on November 10, 1982, plaintiff testified that sale was made by direct communication between him and the program sponsor. That is, plaintiff bought this investment strictly on his own. It was only after the decision was made and investment paid was Hutton informed of plaintiff's investment. It is undisputed that Hutton was not involved in plaintiff's purchase of Woods 82–III.

As previously mentioned, ten of plaintiff's eleven investments were publicly offered partnerships. Plaintiff did, however, invest in one privately offered partnership, Indian Wells Drilling Partnership 81–I. Plaintiff's Indian Wells investment was the single largest investment plaintiff made. It was purchased on February 2, 1981.

Prior to plaintiff's receipt of the Indian Wells offering materials an internal Suitability Questionnaire (Plaintiff's Exhibits 198–199) regarding plaintiff and his financial condition was sent to plaintiff. Although there was conflicting testimony concerning this particular document, it is apparent that it was filled out jointly by the plaintiff and Mr. Potvin. Further, the items that were filled out on the questionnaire and in Mr. Potvin's handwriting were the result of his questioning of the plaintiff. This suitability questionnaire is necessary to determine plaintiff's suitability to receive the offer pursuant to Rule 146, private offering exemption under the Security Act of 1933. (17 C.F.R. 230–146). At the time of filling out of the Suitability Questionnaire, Mr. Potvin was familiar with plaintiff's financial and investment

background both from plaintiff's representations to him and also his familiarity with plaintiff's financial and investment background by direct experience in handling plaintiff's accounts. At the time of filling out of the Suitability Questionnaire, the court is satisfied from the evidence that Mr. Potvin believed the information therein to be accurate and had reasonable grounds to believe that plaintiff was in fact suitable. The completed questionnaire was forwarded to Hutton in New York.

Plaintiff was deemed suitable to receive the offer pursuant to Rule 146 and thereafter received the Indian Wells Private Placement Memorandum. (PPM). Based on the PPM, plaintiff chose to invest $150,000 in Indian Wells 81–I. In order to meet the sponsor's suitability requirement, plaintiff completed and signed an offeree questionnaire (Exhibit HPP 16253–16258). In the course of filling out this offeree questionnaire, plaintiff represented by his "X" on page two of the document that his income for the tax year 1980 was $75,000–$100,000. Further plaintiff, on the same document, specifically declined to use the services and advice of an accountant in general and an offeree representative in particular and represented to the sponsor that no such assistance was necessary.

At some point of time in the suitability analysis by the sponsor, it was realized that the plaintiff's representation as to income for the past year did not satisfy the Michigan Uniform Securities Act requirement for exempt transactions (i.e., that the investor's income exceed $100,000 "for his last fiscal year or latest twelve (12) month period.") M.C.L.A. § 451.802(b)(9)(D)(5)(ii). This concern was passed on to Mr. Potvin who contacted Mr. Platsis. Mr. Platsis then wrote a letter to Marian Sanvey, the attorney for Indian Wells, representing that his income for the calendar year 1980 was in excess of $100,000. That letter states, "In reference to my purchase of Indian Wells 81–1 drilling program, I hereby state that my total gross income for the calendar year 1980 was in excess of $100,000.00." (Exhibit IW–13).

Concerning the investment in Indian Wells, Mr. Potvin further advised plaintiff that he could use a Letter of Credit by which his cash investment would be limited to $50,000 and his write-offs would be based on a $150,000 investment. Mr. Potvin then arranged a meeting with a banker, James Allen, to facilitate obtaining a Letter of Credit. This advice, however, was rejected by plaintiff who decided to pay cash because he did not want to pay interest on the letter of credit.

As a result of his investments, plaintiff participated in over 500 separate wells in 11 different states. They were equally divided between "low risk-low reward developmental wells" (drilled into known oil and gas reserves) and "high risk-high reward exploratory wells) drilled outside of the fringes of known reservoirs. It is undisputed that the choice to buy each of the 11 litigated programs was that of the plaintiff. These wells were drilled during the years 1981 through 1985 inclusive. As anticipated, as a result of these investments, plaintiff took substantial write-offs from his taxes in 1980, 1981, and 1982. In 1981, when nine of the eleven investments were made, plaintiff wrote off approximately $190,000. On average, fifty percent of all wells drilled resulted in production. Woods Petroleum and Indian Wells experienced a success rate of over eighty percent.

Plaintiff invested a total of $276,132 in all. $235,000 by July, 1981; $32,000 by the end of 1982; and $9,000 through 1985.

After five years, plaintiff received cash distributions of $77,270.17. He deducted eighty-three percent of his investment dollars from his taxable income. According to plaintiff's testimony at trial, the present value of reserves remaining in all of his programs (apparently four of eleven are now bankrupt) totals $23,000 after taxes.

It is the claim of plaintiff that Mr. Potvin made a number of misrepresentations to him from October, 1980, to July, 1981, concerning gas and oil investments which representations were false and made recklessly and willfully. In addition plaintiff claims that he relied on these false state-

ments to his detriment and that the defendant Hutton is liable for Mr. Potvin's misrepresentations.

Despite this court's repeated advice to Mr. Platsis during the pretrial phase of the case that he obtain counsel, he preferred to handle the case himself. As a result, during the trial it was frequently difficult for the court to determine when Mr. Platsis was testifying as a witness under oath and when he was arguing some point in his capacity as his own lawyer.

Further, his proofs, arguments, as well as his briefs were rambling, poorly organized,* and often obtuse. Frankly, it has been extremely difficult for the court to determine just what specific conduct of the defendant and/or statements Mr. Platsis takes exception to. As best as can be reconstructed, plaintiff claims he told Potvin that after 1981, he expected his income to be in the range of $50,000 a year indefinitely. Further, that Potvin told him: "Oil and gas is for you, that's the thing that's going to preserve your assets"; "oil and gas shelters are superior to owning municipal bonds"; "E.F. Hutton sponsors programs which average returns of $3.00 for every $1.00 invested for six to ten years"; "the SEC prohibits the disclosure of reserves discovered in prior programs of the sponsor whose program is under consideration"; "You have to rely on us, E.F. Hutton is too big, it wouldn't bring junk to the market". Further, plaintiff alleges Mr. Potvin misrepresented return on municipal bonds at only five percent rather than at ten, eleven and twelve percent, tax free. Platsis further claims that he told Mr. Potvin that he couldn't analyze the prospectus issued by the various issuing sponsors because they didn't contain reserve data and Potvin replied, "We have torn these companies apart and put them back together

again, nobody understands them better than E.F. Hutton"; and finally, investors were told that Hutton's due diligence efforts have "paid attention to every detail". Platsis says he told Potvin to treat him "like a little old lady".

In addition to verbal misrepresentations, plaintiff claims the oil and gas programs he purchased were economic disasters from the beginning and this was known to Hutton. It is plaintiff's claim that purchasers should have been warned "you *will* lose all your money", rather than "you *may* lose your money"! Plaintiff claims further he was unsuited by knowledge, education, training and/or investment experiences to evaluate the merits and risks of oil and gas investments. Further, that no investor, except an insider, is capable of evaluating the merits of oil and gas investments from the prospectus alone "because the economic merit or wells to be drilled and past total performances in meaningful terms is not disclosed in the prospectus." Further, Mr. Potvin said, in essence, that limited partnerships were good investments; that investors would have to rely upon the knowledge, skill and integrity of Hutton; that Hutton knew reserve data through its due diligence work but plaintiff could not see them as they were confidential. Finally, plaintiff claims that defendant (or Mr. Potvin) falsified plaintiff's in-house suitability questionnaire. Plaintiff called Claude Osbourne, former officer, Dart Energy Corporation of Michigan as an expert witness. He concluded from a review of the Indian Wells documents that it was not a sound economic investment. Osbourne also reviewed the other oil and gas investments of plaintiff and likewise concluded they were economically unsound. He criticized the practice of escalating oil prices in estimating future returns. Further he stated that

---

* Lord Birkett, the famous British Barrister reminds us in his book *Six Great Advocates* of a comment a British Judge once made to an attorney presenting a bewildering array of facts with little or no order:

'Mr. Smith, do you not think by introducing a little order into your narrative you might possibly render yourself a trifle more intelligible? It may be my fault that I cannot follow you—I know that my brain is getting a little dilapidated; but I should like to stipulate for some sort of order. There are plenty of them. There is the chronological, the botanical, the metaphysical, the geographical, why even the alphabetical order would be better than no order at all.'

for an investor to obtain a competitive and adequate return he should receive $4 for each dollar invested. None of plaintiff's programs met this criteria. Some sponsor materials did include "track records" but according to Osbourne it was so complicated it, in effect, was non-understandable. In conclusion he stated he, himself, would not have made the investments. Plaintiff also called Ted Bien, a stock broker who is familiar with oil and gas training and sales priorities. Although describing in general Hutton's instructions to its sales force, his testimony shed little light on the validity of plaintiff's claims. Eric Dame, also a stock broker, was likewise called by plaintiff. He concluded plaintiff was unsuitable for multiple purchases of oil and gas investments in that his income was too low and that one year of a "spiked" income was inappropriate for these investments. Further, plaintiff's money should have been invested in diversified programs that would not all respond in the same way to unforeseen economic and political events. Finally, he stated that high risk programs should not represent more than 30 percent of one's portfolio, not two-thirds to three-quarters as in plaintiff's situation.

In response Hutton denied Mr. Potvin made any false or actionable representations. That plaintiff was a knowledgeable investor, knew full well the risks inherent in oil and gas programs and made his own investment decisions and is now trying to hold someone else responsible for what, by hindsight turns out to be unwise investment decisions. In addition, Hutton submitted proof that before offering the limited partnerships for sale, it engaged in a four-phase due diligence program comprised of review from "initial due diligence," to Underwriting Committee review to final review by experts. [Plaintiff's Exhibit 43; Testimony of Mr. Holmes.] At phase four of the due diligence program, Hutton engaged the services of accountants, lawyers, private investigators and independent petroleum geologists and engineers. One of Hutton's witnesses, Michael Holmes, was one such engineer. He has a Doctorate in Geology from University College, London, a Masters of Science in Petroleum Engineering from the Colorado School of Mines, 25 years of experience in the private sector with corporations such as British Petroleum and Marathon Oil. The engineers examined sponsor files, questioned sponsor personnel and assessed the economic viability of each program, reporting the results to Hutton both orally and in writing. [Exhibits HPP 134970–135008; HPP 16439–16445.] While some programs were rejected for various reasons during this review and were, therefore, not offered by Hutton, the eleven involved in this case were judged to be economically viable in the economic environment which existed in the 1980 and 1982 period. The Hutton review process was described by Mr. Holmes as "state of the art" at the time. As stated in its brief Hutton alleges this is a case of disappointment rather than deception. That the investments were made just prior to a precipitous and unexpected decline in worldwide prices for oil and gas, which decline had a dramatic effect on the value of plaintiff's investments.

It is the claim of plaintiff that Hutton is liable to plaintiff for violating section 12(2) of the Securities Act of 1933; Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5; the Michigan Consumer Protection Act; section 410(a) of the Michigan Uniform Securities Act; breach of contract, breach of fiduciary duty and violation of the Racketeer Influenced and Corrupt Organization Act (RICO).

## A. ALLEGED VIOLATION OF SECTION 12(2) OF THE SECURITIES ACT OF 1933.

### (1) *Statute of Limitations.*

■ Count I—alleges a violation of Section 12(2) of the Securities Act. Liability under this section attaches to one who offers or sells security by means of a prospectus which includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading ..." without proof of reliance or surrender.

*Sanders v. John Nuveen & Co., Inc.* 619 F.2d 1222.

Based upon the evidence adduced at trial and the applicable law, I am satisfied that all plaintiff's claims under § 12(2) of the Securities Act of 1933 are barred by the one year limitations of Section 13 of the Act. To be timely, the Section 12(2) claim must have been brought within one year after the alleged misrepresentations and omissions were discovered or reasonably should have been discovered. Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m.

As previously noted plaintiff's first ten (10) investments were made from December, 1980, to June, 1981, and his complaint in this action was filed in June of 1983.

The evidence is undisputed that plaintiff had actual knowledge at the time he made his purchases of the alleged omission of prior program rates of return to limited partners and future program projections. He was aware of these omissions and complained about them prior to his purchase of the first investment in December of 1980.

Plaintiff argues strenuously that a fraud was committed upon him because the prospectus in each of the programs in which he invested did not contain reserve reports. Further, that after a year or two when he did obtain reserves, they were incorrectly reported and "concealed economic disaster". However, as previously noted, before investing plaintiff recognized the uncertainty of the venture when he realized no reserves were described in the prospectus put out by the various issuing sponsors. Plaintiff relies upon an unsworn internal Hutton memo, (Jordan Letter) to support his claim of fraud. Admittedly, it refers to unhappy investors who lost money on oil and gas tax shelters. However, that is a far cry from proof of fraud. Before plaintiff invested one dollar in any program, he complained bitterly to Mr. Potvin that the programs did not disclose reserves. Plaintiff has offered no proof that in offerings of this nature, a standard of due care required that reserves be disclosed. (In most new partnerships, no proved reserves were in fact "known" at the time of the offer).

Platsis understood this. He was not misled. He was free to invest elsewhere. Nevertheless, prompted by an overriding desire for a tax write-off he recklessly jumped in anyway.

Plaintiff purchased his eleventh program, Woods 82–II in November of 1982, outside the Hutton system, and, no representations could be said to have been made as to this separate investment.

With respect to all claimed omissions and misrepresentations, the evidence shows that plaintiff should have discovered what he now complains of in the exercising of reasonable diligence long before one year prior to his filing of the action on June 23, 1983. In determining whether an untrue statement or omission should have been discovered by reasonable diligence, the following points are relevant:

1. Plaintiff need not know all of the facts which establish that an untrue statement or omission has been made before the one year period starts to run. *Ingenito v. Bermec Corp.*, 441 F.Supp 525 (S.D.N.Y.1977);

2. When plaintiff has enough facts in his possession to make him suspicious or that ought to make him suspicious, he is deemed to be on inquiry notice of his claim and the one year period will begin to run at that time. *Buder v. Merill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 693 (8th Cir.1981); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 554–555 (S.D. N.Y.1977); *Maine v. Leonard*, 365 F.Supp. 1277, 1281–1282 (W.D.Va. 1973); *Kramas v. Security Gas & Oil Inc.*, 672 F.2d 766, 771 (9th Cir. 1982), *cert. denied* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982);

3. Whether plaintiff should be suspicious is to be tested by whether a reasonable person with the same experience and background of the Plaintiff and with knowledge of the same facts as were known to the Plaintiff would be expected to be suspicious and to make inquiry. *Ingenito v. Bermec Corp., supra.*

4. Whenever plaintiff in the course of the purchase of a security receives oral representations from the seller which are directly contrary to the written representations contained in the offering material, he will be deemed to be on inquiry notice from the moment of the sale. *Kennedy v. Josephthal & Co., Inc.* (CCH) Fed. Sec.L.Rep. § 99,653 (D.Mass.1984); *Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir.1978).

*Kennedy v. Josephthal & Co. Inc. supra*, is particularly pertinent to the instant action. It holds, as a matter of law, when the purchaser of a security receives oral representations contrary to the written representations in the offering materials he is on inquiry notice as of the time the discrepency becomes apparent, that is, upon receipt of the offering materials. The principal is exemplified in this action which plaintiff suggests that Mr. Potvin did something akin to promising him "guaranteed" returns on his investments. As previously noted, Mr. Platsis read the initial prospectus from "cover to cover" and being a lawyer and becoming more expertise all the time in oil and gas leases, he clearly understood the various warnings. He makes no claim to the contrary. The financial risks repeatedly and plainly set forth in the offering materials are wholly inconsistent with any promise of "guaranteed" returns. Each offering document highlights the fact that the investor could in fact lose all of his money. Likewise, the investor was specifically advised that he must not rely upon any oral representation. Consequently, upon receipt and review of the materials, plaintiff unquestionably knew or certainly should have known that any suggestion of a promised return, if actually made, was made without any factual basis, was of questionable merit and potentially false. At that time, the statute of limitations began to run with respect to those alleged representations. The burden of proving compliance with the statute of limitations is upon the plaintiff. It is his burden to prove by a preponderance of the evidence that he did not discover and through the exercise of reasonable diligence could not have discovered that misrepresentations or omissions were made until some time within the twelve (12) months preceding the commencement of the action. This, plaintiff has not done.

Although I am satisfied the § 12(2) claims are barred, nevertheless, I am also convinced from the evidence that defendant did not, in fact, commit § 12(2) violations.

(2) *Alleged Oral and Written Misrepresentations.*

Plaintiff argues that Hutton's account executive, Joseph Potvin, violated § 12(2) of the Securities Act of 1933 and that Hutton shares responsibility for the violation under the theories of respondeat superior, aiding and abetting and control person liability. Plaintiff testified that in the course of offering the litigated investments, Mr. Potvin made certain statements to him that the plaintiff believes to be false and that Mr. Potvin provided him with written materials which contained misrepresentations.

First, it should be noted that written misrepresentations outside of the prospectus are not actionable by § 12(2) of the Act. Section 12(2) of the Act which covers oral and written misrepresentations, or omissions are limited to the prospectus. Thus, any written misrepresentations which occur outside the prospectus are not actionable under § 12(2). Plaintiff testified that he received the reserve reports dated March 25, 1981, regarding prior Indian Wells programs but that such reports were delivered after his investment in Indian Wells. Claims based on such receipt are not actionable. With respect to the Hilliard reserve numbers, plaintiff's testimony reveals that he "may" or "may not" have received the Hilliard reserve reports prior to his investment in the Hilliard program. The admission regarding the Indian Wells reserve reports and plaintiff's inability to recall when he received the Hilliard reports satisfies the court that plaintiff has failed to prove his claim in connection with written misrepresentations. *See Marsh v. Ar-*

*mada Corp.,* 533 F.2d 978, 982, n. 3, (6th Cir.1976), *cert. denied.* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). "Standing is not awarded a plaintiff if his purchase or sale occurs before the alleged [wrongful] conduct."

■ With regard to the alleged oral misrepresentations claimed to have been made by Mr. Potvin, I find that plaintiff failed to meet his burden of proof by a preponderance of the evidence that the representations were made much less false.

■ Plaintiff has also failed to prove that the representations, if false, constitute actual misrepresentations of fact. To be actionable, a misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge. *Higgins v. Lawrence,* 107 Mich.App. 178, 309 N.W.2d 194 (1981); 37 Am.Jur.2d *Fraud and Deceit* § 45. A statement of opinion or belief such as occurs in "puffing" generally cannot constitute a misrepresentation. W. Prosser, *The Law of Torts,* § 10.9, at 726 (4 ed. 1971).

■ Furthermore, projections and financial forecasts made on a reasonable basis are not actionable merely because they may ultimately prove incorrect. *Polin v. Conductron Corp.,* 552 F.2d 797 (8th Cir. 1977), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); *Lucas v. Florida Power & Light Co.,* 575 F.Supp. 552, 569 (S.D.Fla.1983). And as a general rule, an honest but mistaken estimate as to the value of a business is generally considered to be an opinion and not an actionable misrepresentation. *Essenburg v. Russell,* 346 Mich. 319, 78 N.W.2d 136 (1956).

■ To be actionable, the alleged misrepresentations must be "material." A fact is "material" if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision. *S.E.C. v. Washington County Utility District,* 676 F.2d 218 (6th Cir.1982). Whether or not the misrepresented or omitted fact is important turns on objective determination of whether a reasonable investor would regard it as signifi-

cantly altering the total mix of information made available to him. *Austin v. Loftsgaarden,* 675 F.2d 168, 176 (8th Cir.1982).

In this case reserves were not disclosed initially. Plaintiff understood the significance of not having that data. He complained. He got no satisfaction. Yet, he invested anyway. If blame is to be assessed, he has only himself to blame. Nor has plaintiff produced evidence for the court to find that a reasonably prudent investor would consider the alleged misrepresented matters important in making an investment decision.

For the foregoing reasons, plaintiff has failed to prove that Hutton's Account Executive Joseph Potvin violated § 12(2) by virtue of oral or written misrepresentations of material facts in the sale of the litigated partnership interests.

■ Furthermore, plaintiff has also failed to prove that Hutton should share liability for any violation of § 12(2) that Mr. Potvin's actions may have precipitated. As noted, plaintiff's claims against Hutton regarding alleged oral or written misrepresentations by Mr. Potvin (plaintiff's claim for secondary liability) is founded on the theories of respondeat superior, aiding and abetting and control person liability pursuant to Section 15 of the Securities Act.

Plaintiff, in effect, abandoned these theories at trial, having produced no evidence regarding them whatsoever. Plaintiff has not proven that Mr. Potvin's alleged actions were within the scope of his authority as a Hutton Account Executive, as liability under the theory of respondeat superior would require. In fact, the evidence shows that by virtue of statements within the offering documents read by plaintiff, plaintiff was aware that Mr. Potvin had no authority to make oral or written representations. Plaintiff's knowledge of Mr. Potvin's limited authority precludes liability against Hutton on the respondeat superior theory. *Holloway v. Howerdd,* 536 F.2d 690 (6th Cir.1976); *329 N.W.2d 824, 827 (Minn.1983); Restatement of the Law of Agency 2d,* § 1662 and § 260.

In addition, plaintiff has failed to prove that Hutton as an entity knowingly and substantially assisted in a violation of § 12(2). Accordingly, no liability can be found against Hutton under the aiding and abetting theory. *SEC v. Coffey*, 493 F.2d 1304, 1306 (6th Cir.1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

Finally, plaintiff produced no evidence that Hutton actually participated in and exercised control over the operation of Mr. Potvin or that Hutton possessed the power to control the specific transaction or activity which allegedly constitutes the violation of § 12(2), each as required by § 15 of the Act for the assertion of control person liability. Accordingly, Hutton cannot be held liable for any violations of § 12(2) that may have been committed by Mr. Potvin.

### (3) *Alleged Omissions.*

■ Plaintiff alleges that the offering materials were misleading because they omitted to state material facts necessary to make the statements that were made not misleading. Specifically, plaintiff alleges that the following facts were omitted from the offering materials:

(1) The Rate of Return or Return on Investment that limited partners in prior sponsor programs realized or would realize (or reserve data and production scheduling from which such returns could be calculated); and

(2) Projected reserves of the partnership in formation.

As previously indicated, the evidence in this case demonstrates, beyond any doubt, that the plaintiff was aware of the above alleged omissions prior to his investment in any of the litigated investment programs. Plaintiff's knowledge of the omissions is alone fatal to his claim.

■ Further, plaintiff has failed to prove that the above omissions were material. Evidence in the record convinces the court that information regarding the past performance of unrelated partnerships and "speculative projections" are not the type of facts that would, in the mind of an ordinary reasonable investor, be important in making his investment decision.

The inclusion of information regarding prior program performance, whether in the nature of rate of return or reserve calculation, coupled with the implication that it is reasonable for an investor to rely on the information as an indication of future program performance could itself be misleading. The past performance of prior sponsor programs, which involve different leases perhaps in different states, is in no way an indication of how the partnership in formation will fare. As demonstrated at trial, the inconsistent results of prior Woods programs demonstrates the folly of projecting a return for a new program based on a prior program.

■ Plaintiff argues that guidelines of the North American Security Administrators Association require disclosure of certain information regarding the past performance of prior programs of the general partners. It should be noted that these guidelines were not adopted in Michigan until the spring of 1983, after plaintiff's investments. Accordingly, they cannot be deemed binding at the time of plaintiff's investment.

■ More importantly, the guidelines do not require the disclosure of that which plaintiff complains. The guidelines specifically provide, at Section X(B), that with respect to offerings registered with the SEC, a filed prospectus "shall be deemed to comply with all requirements as to form of these guidelines; provided, however, that the Administrator reserves the right to require additional disclosure of substance in his discretion." The guidelines simply suggest the type of information that should be disclosed regarding the past performance of prior partnerships of the general partners "when *required* or *permitted* by the [state] administrator." *See* § X(C)(k), Statement of Policy for Registration of Oil and Gas Programs, currently reported at Blue Sky L.Rep. (CCH) ¶ 5231 at p. 1237 (1985). In other words, the individual state administrator would have to make an inde-

pendent judgment that such disclosure was appropriate before the disclosure would ever be "required" under the guidelines. Also it is noted that when the guideline disclosure is mandated, the guidelines themselves require that the following caveat be "prominently featured" in the presentation of the past performance information:

It should not be assumed that participants in the offering covered by this Prospectus will experience returns, if any, comparable to those experienced by investors in the prior program.

§ X(c)(k)(4).

The necessity of this disclaimer highlights the fact that information regarding the performance of prior partnerships of the general partner is not material and may in fact be misleading.

As a secondary argument, plaintiff claims that reserve reports of prior programs should be disclosed so that the rate of return to limited partners of the prior programs may be calculated. Again, it should be noted that rates of return are not material as indicative of the future performance of the partnership in formation. More importantly, during the period in which plaintiff invested in the litigated oil and gas limited partnerships (December 1980 to November 1982), the SEC's Rules, Regulations and Forms did not require that a registration statement or private placement memorandum or other offering material of an oil and gas limited partnership include disclosure of oil and gas reserve data with respect to prior limited partnerships for which the prospective general partner had acted as a general partner. Indeed, oil and gas limited partnerships are and were specifically exempt from quantity reporting in offering documents. *See, generally* Form 5-1 [registration statement form] (CCH) Fed.Sec.L.Rep. ¶¶ 7121-7126; Item 102 of Regulation S-K [nonfinancial statement disclosure rule] 17 C.F.R. § 229.-102 (1985); and [Industry Guidelines—Disclosure of Oil and Gas Operations] CCH) Fed.Sec.L.Rep. ¶ 3826 [former Item 2, Regulation S-K].

Current Industry Guide 2, *supra,* requires disclosure of certain information regarding the past performance of corporations in the oil and gas business, but provides an exemption from the disclosure requirements thereof for limited partnerships that conduct oil and gas drilling programs. The same exemption was contained in Item 2 of Regulation S-K effect from 1978 until 1982 when the provision was deleted from Regulation S-K and placed in Guideline 2 in a revision adopted in Securities and Exchange Commission Release N. AS-306, effective May 24, 1982. Item 2 of Regulation S-K, in effect at the time plaintiff made his investments, provided in relevant part as follows:

Regulation S-K

\*　　\*　　\*　　\*　　\*　　\*

(b) If oil and gas operations are material to the registrant's and its subsidiaries' business operations or financial position, disclose the following under appropriate captions (in tabular form if practicable, and with cross references, where applicable, to related information disclosed in financial statements):

### General Instructions

Instruction 1: *Limited partnerships or joint ventures that conduct, operate, manage or report upon oil and gas drilling or income programs which acquire properties either for drilling and production, or for production of oil, gas or geothermal steam or water are not required to include the information specified by this Item 2(b).* (Emphasis added.)

\*　　\*　　\*　　\*　　\*　　\*

Instruction 4: *Estimates of probable or possible reserves and any estimated value thereof shall not be disclosed in any document publicly filed with the Commission.* (Emphasis added.)

2(b)(1)(i) As of the end of each of the last five fiscal years, (but not for fiscal years ending prior to December 25, 1978), estimated net quantities of: (A) proved oil and gas reserves; (B) proved developed oil and gas reserves; (C) oil

and gas applicable to long-term supply or similar agreements with foreign governments or authorities in which the registrant acts as produced; and (D) the registrant's share of reserves of investees accounted for by the equity method.

(ii) For each of the net quantities reported, the present value of estimated future net revenues, computed in accordance with Regulation S–X, § 210.3–18(k)(6).

■ As a matter of law, materials specifically exempted from disclosure by the Securities and Exchange Commission cannot, by their omission from offering documents, form the basis of a 12(2) violation. At the very least, the existence of the exemption is evidence that the information sought by plaintiff is not "material" and probably misleading.

■ Plaintiff claims a "material omission" from the offering memoranda, arguing that the memoranda should have, but did not, include estimates of reserves and the present value of those estimated reserves, thus giving the offerees an opportunity to assess the economic viability of the programs and compare them with other potential investments.

Legally, there is no requirement that a sponsor include such information in an offering memorandum. Factually, to do so is dangerous and may well mislead potential investors.

Plaintiff himself offers the best argument against the use of such estimates in a prospectus. Because the partnerships had not been formed when the offers were made, few, if any, leases had been identified to the programs, and in no case had wells been drilled. Consequently, the inclusion of estimates (perhaps more accurate— "guesstimates") of available reserves creates the potential to seriously mislead potential investors. Platsis was upset at the use of such estimated reserves in periodic reports received from sponsors. Platsis criticized the reports in the following language:

And, more importantly, one-third of their reserves represented so-called undeveloped reserves, and they put the word "proved" in front of it.

Now that is deceptive for the additional reason that that is just a fancy word for developmental wells to be drilled.... They really don't know if the geological structure ends five feet from the adjacent well or not, but they included them as part of the reserves.

[B]anks never loan money on proved undeveloped reserves. They're too risky. Well, if banks won't loan money on it, why should it be reported to limited partners.

P. 4, 6, transcript of excerpts from plaintiff's opening statement.

Thus, Platsis criticizes sponsor's reports to actual investors which are based on reserves which are "proved undeveloped," that is, not being presently tapped with existing wells—because they are "too risky." At the same time, he argues that the offering memoranda inviting new participants ought to contain such information. Platsis acknowledges that the reserves he would have disclosed in offering memoranda are, at best, "proved undeveloped" reserves.

The evidence establishes that preliminary estimates based on "proved undeveloped" reserves are "too risky," and, if included in offering memoranda, may tend to mislead investors. To avoid this dilemma Hutton's testimony established that it took the position that it is preferable to warn potential investors that the programs involve a high degree of risk and are speculative; that there is a danger that no oil will be found and, even if found, might not be in sufficient quantities to produce a profit; that other identified market risks, exist, and investors may well lose their entire investment.

Not only did the offering memoranda contain such explicit warnings, Platsis acknowledges reading such warnings before he invested. The warnings are conspicuous, clear and readily understandable. There can be no credible argument that

Platsis was unaware of the risk before he invested.

■ Plaintiff further alleges that the prospectuses failed to disclose that the investments were "noneconomic." Plaintiff has failed to prove that the litigated partnership investments were in fact noneconomic and the evidence indicates they were economic at least in the environment in which they were offered.

Plaintiff's principal proof on the matter was offered by his expert, Claude Osborne. Mr. Osborne, plaintiff's neighbor, was an officer of Dart Energy Corp., a corporation which sought and was denied Hutton's assistance in forming and marketing an oil and gas limited partnership. Mr. Osborne did not testify that the offerings were worthless but only related his personal judgment that they did not offer a high enough potential return commensurate with the risks involved when compared to alternative investments without regard to the tax impact of such alternative investments. Mr. Osborne in fact cited and adopted as accurate an article by Charles E. Ramsey, Jr. entitled *"Economic Merits and Comparisons"* [Plaintiff's Exhibit 197] which compares after-tax oil and gas investments with municipal bond investments and not only validates the former as "economic" but also proves the former viable in comparison with the latter. In sum, Mr. Osborne testified merely that were it his money, he would have picked a different investment vehicle.

Hutton, through the testimony of Michael Holmes, an independent oil and gas consultant, offered proof that oil and gas investments were in fact, "economic" or at least had been during the seventies and early eighties when the price of oil was on the increase. Sales of tax shelters by Hutton grew steadily from 2.5 million in 1970 to almost 300 million in 1979. In a detailed analysis of the economics of oil and gas tax shelters, Frazier Stewart in *Oil Drilling Programs, Stimulant to Oil Development,* published in the Journal of Petroleum Technology which was offered as Exhibit 28, said as follows:

"The exploration-oriented program carries a relatively high risk, the theory being that the tax-savings incentive provides relatively low-cost dollars for exploration, with the hope of finding large reserves that yield a high return. Of course, successful wells have to pay for dry holes, so results to investors on any one program can vary from nothing to a large return. ...

There is much uncertainty on the part of investors and securities houses as to the profitability of programs to investors. There is similar speculation within the petroleum industry and even by competitor program sponsors. As a matter of fact, some sponsors have not analyzed objectively their own past programs from their investors' standpoint.

Resource Consultants has analyzed the past performance of most public drilling programs, and as might be expected, the results of some programs are reasonably good, some mediocre, and some poor. A pre-tax return (net operating income ultimately returned to the investor divided by paid-in capital) of 1.0 to 2.0 is considered acceptable. After taking into account tax effects, the return for that range is more on the order of 1.25 to 3.5, assuming deductibility of 80 percent or more and a tax bracket of 50 percent or higher. ...

The consensus of leaders in the drilling program field is that growth of drilling programs will continue and that they will fill an important need for capital in petroleum exploration and production. Drilling programs are a means of mobilizing capital from investors into a job that must be done and for which Congress has authorized the long-standing incentives of expensing intangible deductions and the depletion allowance."

In addition, it was testified to by Mr. Holmes' that unanticipated economic conditions brought on a disappointing performance of plaintiff's oil and gas investments. That is, the value of the discoveries was less than the industry anticipated in the 1982 environment solely due to decreasing

prices. At the very least, Hutton has established to the satisfaction of the court that through its due diligence reports it had a reasonable belief that the programs were economically viable under all the circumstances known to Hutton at the time of the offering. Plaintiff's three experts, only one of whom could legitimately be classified as an economic oil and gas industry expert, failed to convince me by a preponderance of the evidence, that the marketing of the oil and gas programs in which plaintiff invested constituted a material misrepresentation or omission under Section 12(2).

### B. ALLEGED VIOLATIONS OF SECTION 10 OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b–5.

Plaintiff contends that by virtue of the same alleged oral and written misrepresentations referred to above, Hutton is liable for a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission. Plaintiff contends further that Hutton also violated Rule 10b–5 by perpetrating a "fraud on the market" in the sale of the limited partnership programs.

 In contrast to 12(2) it is well established that to establish a violation of 10(b) of the Exchange Act, Proof of scienter and reliance as well as material misrepresentations or omissions is required. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668.

#### (1) *Alleged Oral and Written Misrepresentations.*

 Plaintiff argues that Mr. Potvin, by virtue of the alleged oral and written misrepresentations discussed *supra,* violated Section 10(b) and Rule 10b–5. Plaintiff also alleges that Hutton shares liability for the alleged violation under principals of respondeat superior, aiding and abetting and control person liability pursuant to § 20(a) of the Securities Exchange Act of 1934. In order to recover under Section 10(b) and Rule 10b–5 on the claim that

affirmative oral or written misrepresentations existed in the purchases of the limited partnership interest, plaintiff must prove by a preponderance of the evidence; ... 1) The use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing all damages. *Mansbach v. Prescott, Ball & Turben,* 598 F.2d. 1017, 1026 (6th Cir.1979).

 I am satisfied plaintiff has failed to prove a violation of Rule 10b–5 based on alleged oral or written misrepresentations, i.e., plaintiff has failed to prove by a preponderance of the evidence that Hutton employed a deceptive or manipulative device in its dealings with plaintiff.

Additionally, plaintiff has failed to prove that Mr. Potvin acted recklessly, i.e., that Mr. Potvin's conduct was highly unreasonable, which constituted an extreme departure from the standards of ordinary care. *Ohio Drill & Tool Company v. Johnson,* 625 F.2d 738 (6th Cir.1980); *Ingram Industries, Inc. v. Nowicki,* 502 F.Supp. 1060 (E.D.Ky.1980); *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 193 (3rd Cir.1981), *cert. denied* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

 Plaintiff has not only failed to prove scienter on Mr. Potvin's part, but virtually absolved him of all wrongdoing by testifying that Mr. Potvin "was a victim himself." Accordingly, plaintiff having failed to make a showing of scienter, may not recover for an alleged violation of Rule 10b–5 by means of oral misrepresentation.

 Nor has plaintiff proven by a preponderance of the evidence that he justifiably relied on any misrepresentations that may have been made in connection with the litigated investment programs. To prove reliance, plaintiff must prove that the misrepresentation actually and reasonably induced him to act differently than he otherwise would have if the truthful fact had

been disclosed and that by an objective standard such reliance was justified under all the circumstances. *Schick v. Steiger*, 583 F.Supp. 841 (E.D.Mich.1984); *St. Louis Union Trust Company v. Merrill Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040, 1048 (8th Cir.1977); *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). *Austin v. Loftsgaarden*, 675 F.2d 168, 177 (8th Cir.1982); *Vervaecke v. Chiles, Heider & Company, Inc.*, 578 F.2d 713 (8th Cir. 1978). Proof of justifiable or reasonable reliance requires plaintiff to establish that he acted reasonably in believing and placing reliance upon the misrepresented fact. *Vervaecke v. Chiles, Heider & Company, Inc., supra.*

Where an investor is presented with oral representations in the offer or sale of an investment which conflict with written representations made in the Offering Memorandum, or where he is expressly warned in the Offering Memorandum that any oral representations which are inconsistent with the written representations contained therein are unauthorized and are not to be relied upon, it is not reasonable for an investor to rely upon such oral representation and as a matter of law the element of justifiable reliance is not satisfied. *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir.1983).

In this action, plaintiff was supplied with documents detailing the risks of investment. Plaintiff was informed that no individual was authorized to make representations involving the program and that he was to rely solely upon the written memorandum. Plaintiff, in fact, represented in a signed document addressed to Hutton and the sponsor that in making his investment decisions he did in fact rely solely upon the written offering memoranda. In view of plaintiff's sophistication, education, and admission that he read the materials "cover to cover", the court is not persuaded that he in fact relied on oral statements or, in any event, that such reliance, if any, was justified.

Although more properly a proposition relating to damages than causation, in order to recover under § 10(b) and Rule 10b–5, plaintiff must prove by a preponderance of the evidence that his monetary loss, if any, was directly and proximately caused by the misrepresentations and omissions which he alleges were made. This causation requirement is satisfied in a § 10(b) and Rule 10b–5 case only if the misrepresentation touches upon the reason or reasons for plaintiff's pecuniary loss. If the investment decision is induced by misstatements or omissions that are material and are relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the statute and the rule is not permitted. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re Catanella and E.F. Hutton & Company Inc. Securities Litigation*, 583 F.Supp. 1388, 1415–1417 (E.D.Pa.1984). In this action, the evidence establishes that plaintiff made his investments at the worst possible time. In the decade preceding, oil and gas were "boom" investments and the price of oil was steadily increasing. In the early eighties, the trend reversed and the price of oil collapsed and has continued to the present time. By 1986, the oil industry was in a deep depression with oil down from $35 a barrel in 1980, to as low as $11 a barrel. The court is satisfied from the evidence plaintiff's monetary loss was the direct result of external market conditions and not the results of any misrepresentations or omissions which may have been made. As indicated above, the time periods relative to plaintiff's investments were marked by an industry-wide collapse of oil and gas prices due to deregulation of the oil industry and a glut in oil supplies. Even the most sophisticated investors, such as major oil corporations, institutional lenders and banks, lost millions of dollars as a result of the sudden increase in oil supplies and the unexpected drop in prices. Accordingly, plaintiff's claim of causation is broken. Simply put it is neither Hutton nor the

sponsors' fault that plaintiff may have suffered loss as a result of the drop in prices. *Huddleston, supra; In re Catanella, supra,* 583 F.Supp. at 1416; *Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 593 F.2d 736, 743–744 (6th Cir.1979).

#### (2) *Alleged Omissions.*

Plaintiff contends that by virtue of certain alleged omissions Hutton is liable for a violation of Rule 10b–5.

■ In order to recover on his claim that there were omissions of material facts in the sale of the limited partnership interests, plaintiff must establish by a preponderance of the evidence for each of the investments, all of the following elements: (a) The defendant must make a false representation of a material fact, (b) knowing its falsity and intending that plaintiff rely on it, (c) the plaintiff must justifiably rely on it, and (d) suffer damages as a result. *See* 111 L. Loss, *Securities Regulation* 1431; *Dupuy v. Dupuy* 551 F.2d 1005, 1014 (5th Cir.1977), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

■ As discussed *supra,* plaintiff had knowledge of the alleged omissions of information prior to investing. The fact that plaintiff knew of these alleged defects but purchased anyway is fatal to his claim.

And, as previously noted, plaintiff has failed to prove that any alleged omissions were "material."

With regard to plaintiff's allegation that Hutton failed to disclose that the programs were "noneconomic," as discussed earlier in this opinion, I am not convinced by a preponderance of evidence that the programs at the time of sale were, in fact, non-economic.

■ More importantly, however, plaintiff has offered no proof that Hutton acted with scienter. Although plaintiff produced some evidence to support his claims the programs were "losers from the start", he has not persuaded me by a preponderance of evidence that that was so. In fact, the evidence shows that Hutton conducted state of the art due diligence studies with respect to each program in which plaintiff invested. During the course of his due diligence studies, Hutton found nothing which should have prevented it from selling the programs. Once wells are dug. and millions of dollars spent with nothing to show but dry holes, it is not surprising that investors would claim the project was "noneconomic". This is particularly true when the investor enters the market at the peak of oil prices and where they have then fallen steadily ever since.

For the foregoing reasons, plaintiff may not recover on his claim that Hutton violated Rule 10b–5 by virtue of omissions of material fact in the offering materials.

#### (3) *Alleged Fraud on the Market.*

Plaintiff further claims that Hutton committed a "fraud on the market" in violation of Rule 10b–5. Plaintiff alleges that Hutton knowingly or recklessly sold "junk" and that the only reason the programs were marketable is because Hutton sold them.

■ There are four general elements to be proven by a purchaser asserting a fraud on the market theory of liability. First, the security must be "on the market" which means that it is available for purchase through some medium not requiring direct communication between the plaintiff and either the issuer or a prior holder. Second it must be unmarketable, meaning a security so lacking in basic essentials that, absent fraud, it would never have been issued or marketed at any price. Third, the security must have reached the market as a result of the fraudulent scheme and as a result of the scheme to defraud plaintiff suffered a loss. Finally, reliance on the integrity of the market must be shown, i.e., a reliance that the securities would not be on the market unless entitled to be marketed. *See, Rose v. Arkansas Valley Environmental & Utility Authority,* 562 F.Supp. 1180, (CCH) Fed.Sec.L.Rep. ¶ 99, 224 (W.D.Mo.1983) at pp. 95, 940–41, *and cases cited therein,* i.e., *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981), (en banc), *cert.*

*denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Dekro v. Stern Bros. & Co.,* 540 F.Supp 406 (W.D.Mo.1982); *Frankel v. Wyllie & Thornhill Inc,* 537 F.Supp. 730 (W.D.Va.1982).

The "market" upon which the plaintiff "relied" is not the type of market encompassed by the fraud on the market theory. Plaintiff did not purchase on an open market, but in fact purchased through direct contact with the issuer via the prospectuses and the private placement memoranda. Accordingly, the fraud on the market theory is inopposite to the facts of this case.

Regardless, plaintiff has failed to prove that the litigated programs were "unmarketable," i.e., so lacking in basic essentials that absent fraud, they would never have been marketed at any price. Plaintiff's own expert, Osborne, did not take the position that the programs were "lacking in basic essential" but only suggested that better investments might have existed at the time of plaintiff's investment. And, in contravention of plaintiff's proof, Mr. Holmes testified that looking forward from 1980 and 1981, in the climate of rising oil prices, the programs were indeed economic. For the foregoing reasons, plaintiff's "fraud on the market" theory of liability under Rule 10b–5 must fail.

### C. ALLEGED VIOLATION OF § 11(a) OF THE SECURITIES ACT OF 1933.

Plaintiff alleges that Hutton violated § 11(a) of the Securities Act, which provides in pertinent part:

> (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of compe-

tent jurisdiction, sue [to recover the damages specified in § 11(e)]

\* \* \* \* \* \*

§ 11(a) Security Act of 1933, 15 U.S.C. § 77k(a).

Section 11 focuses entirely on the registration statement filed with the Securities and Exchange Commission; oral representations are not at issue under § 11.

Not having offered into evidence the registration statements, plaintiff's Section 11 claims fail for lack of proof. Further, for the same reasons set forth above. Plaintiff's § 11 claims are time barred by the limiting provision of § 13.

And likewise for the reasons previously discussed, I am satisfied that plaintiff has not proven the materiality of any alleged written misrepresentations or omissions in the registration statement.

Finally, plaintiff had knowledge of the alleged omission and is thereby barred from recovery thereon.

Of greater significance, however, plaintiff has completely failed to offer essential proof on this claim. Plaintiff has not presented to the court copies of any registration statements from which the court could find violations of § 11. Nor did plaintiff produce the testimony of any witness who had read the registration statements, or who attested to their content. Plaintiff has the initial burden of showing the existence of the omission. He has not carried this burden.

Plaintiff produced at trial the prospectuses which are typically an attachment to the registration statements. Plaintiff requests the court to make the assumption that since a fact is not set forth in the prospectus, it is not set forth anywhere in the registration statement. Not having demonstrated to the court that the omission or misrepresentations actually exist, plaintiff can assert no claim for alleged omissions or misrepresentations in the registration statements.

Moreover, proofs establish that Hutton conducted due diligence investigations and had reasonable grounds to believe and did

believe that the challenged portions of the registration statements were true and complete. Under § 11, Hutton does not have a duty to conduct due diligence. Having done so, however, and the results thereof having demonstrated that Hutton had no reason to forebear from offering the eleven programs, Hutton is absolved of any liability which might have attached due to errors in the registration statement of the sponsors.

### D. ALLEGED VIOLATION OF § 12(1) OF THE SECURITIES ACT OF 1933.

Plaintiff alleged in his Verified· Second Amended Complaint that the sale to him of his interest in Indian Wells 1981–I, Ltd. constituted a violation of § 12(1) of the Act. Section 12(1) makes actionable a violation of § 5 of the Act which proscribes the sale of an unregistered security in a non-exempt transaction.

By Order and Opinion dated January 11, 1985, this court dismissed plaintiff's claim for any alleged violation of § 12(1) as time barred by § 13 of the Act which provides in pertinent part:

> No action shall be maintained to enforce any liability created ... under [Section 12(1) unless brought within one year of the violation upon which it is based.

Security Act of 1933, § 13, 15 U.S.C. § 77m.

The court at that time held that any violation of § 12(1) occurred in 1981 when Hutton allegedly failed to file a registration statement regarding the Indian Wells offering. *See,* Opinion p. 3. Since plaintiff did not file his complaint until June 23, 1983, he did not meet the one-year statutory period of § 13.

Plaintiff at that time sought to avoid the effect of the statute of limitations by invoking the federal tolling doctrine based on fraudulent concealment. Under this doctrine, when a defendant fraudulently conceals its illegal conduct, the statute of limitations is tolled until the fraud is or should have been discovered. *See,* Opinion p. 4. This court held at that time that plaintiff

could not invoke the doctrine for want of clear allegation of fraudulent concealment or fraud. *See Id., citing Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890, 901 (D.Me.1971).

At the pretrial conference of November 15, 1985, plaintiff was granted leave to amend his complaint to ·allege that Hutton fraudulently concealed from him that he was an unsuitable investor under Rule 146 (17 C.F.R. § 240.146) and that the Indian Wells 1981–I program lost its exempt status under federal law. Plaintiff perceives that his unsuitability under Rule 146 would render the exemption claimed by Hutton pursuant to Rule 146 "lost" and would create a liability for a sale of an unregistered security in violation of § 5 and § 12(1).

In order to invoke the theory of fraudulent concealment, plaintiff must plead three elements with particularity:

> (1) wrongful concealment of facts giving rise to plaintiff's cause of action;

> (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitation period; and

> (3) plaintiff's due diligence until the discovery of the facts.

*Campbell v. Upjohn Co,* 498 F.Supp. 722, 727 (W.D.Mich.1980)

Since the doctrine of fraudulent concealment is in avoidance of the statute of limitations, the party seeking its benefit must prove each element. *Id.* Indeed all presumptions are against him since his claim in avoidance of the statute of limitations is "against the current of the law." *Akron* 496 F.2d 230, 233 (6th Cir.1974), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

From plaintiff's burden of proving the wrongful concealment of facts giving rise to his cause of action flows *a fortiori* his burden of proving the existence of the facts allegedly concealed. It goes without saying that one cannot conceal that which does not in fact exist. Accordingly, to invoke the theory of fraudulent concealment,

plaintiff must first prove that he was in fact unsuitable and that the Indian Wells offering did in fact lose its exempt status under federal law. This plaintiff has not done.

Hutton claims its exemption under federal law pursuant to the "safe harbor" Rule 146. The Rule 146 requirements as to the suitability of the investor are set forth below:

(d) *Nature of offerees.* The issuer and any person acting on its behalf who offer, offer to sell, offer for sale or sell the securities shall have reasonable grounds to believe and shall believe:

(1) Immediately prior to making any offer, either:

(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or

(ii) That the offeree is a person who is able to bear the economic risk of the investment; and

(2) Immediately prior to making any sale, after making reasonable inquiry, either:

(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or

(ii) That the offeree and his offeree representative(s) together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment and that the offeree is able to bear the economic risk of the investment.

Rule 146 does not require an investor to be suitable. It only requires that the seller and issuer have reasonable grounds to believe and in fact believe that the investor was suitable. Two separate standards are set forth with Rule 146 relative to first, the offer, and second, the sale. Prior to making the offer the issuer and seller must reasonably believe, simply stated, (1) that the investor is sophisticated or (2) that the

investor can bear the risk of losing all his money. Before making the sale, the issuer and seller must reasonably believe, (1) that the offeree is sophisticated or (2) that the offeree and his representative together are sophisticated and that the investor can bear the risk of losing all his money.

Finally, Rule 146 does not have a specific income or net worth requirement per se. The specific income and net worth requirements discussed at length at trial are income and net worth requirements established under Michigan's Blue Sky Law and not Rule 146.

Plaintiff has not established that he was unsuitable to receive the offer or sale pursuant to Rule 146. Plaintiff has not shown that prior to receipt of the Indian Wells offering materials he was both unsophisticated and that he was unable to bear the economic risks of his prospective investment. And, plaintiff has failed to prove that prior to the time of sale he was not sophisticated.

In fact, plaintiff concedes his "sophistication." He admits that he qualifies under the NASAA guidelines, which also require both sophistication and wealth. While the "wealth" standards differ, the sophistication standards of the NASAA guidelines parallel the requirements of Rule 146 (and, for that matter, the Michigan Blue Sky law).

All proofs indicate that plaintiff was at all times relative to his complaint sophisticated enough to understand the merits and risk of his investment and in a position to bear the economic risks such that he could bear the loss of his investment. In light of the proofs, plaintiff has failed to demonstrate that he was in fact unsuitable.

Even if plaintiff was unsuitable, that would not establish that Hutton violated Rule 146. As already pointed out, plaintiff's suitability is not the issue in determining the existence of the Rule 146 exemption. The crucial issue under the Rule is not an investor's actual suitability, but the issuer and seller's reasonable grounds in believing that the plaintiff was

suitable. Plaintiff has offered no evidence as to Hutton's or the sponsor's beliefs at the time of sale or the reasonableness of that belief. The only evidence in the case is that Hutton did reasonably believe that plaintiff was suitable. Finally, even if Hutton concealed from him the "fact" that it had violated Rule 146, such does not automatically cause the "loss" of exempt status under federal law. Rule 146 is a "safe harbor" provision under the general private offering exemption of § 4(2) of the Act and non-exclusive, i.e., an issuer may still qualify for exemption under § 4(2) even if in violation of Rule 146. Plaintiff has failed to prove that Hutton did not comply with § 4(2) and has therefore wholly failed to prove that the Indian Wells program lost its exempt status under federal law.

■ Accordingly, for the foregoing reasons, plaintiff has failed to prove the existence of the very facts allegedly concealed from him. First, that he was unsuitable under Rule 146; secondly, that Hutton knew he was unsuitable and thirdly, that Indian Wells program lost its exempt status. There being nothing to conceal, plaintiff cannot now successfully invoke his theory of fraudulent concealment.

To the extent the evidence might suggest that plaintiff's suitability for Indian Wells was in doubt and that fact was concealed from him, plaintiff has wholly failed to meet his burden of proving that he did not know of the alleged facts concealed and that he exercised due diligence prior to the revelation of those facts. Plaintiff testified concerning a telephone call from Mr. Potvin prior to his investment in Indian Wells in which Mr. Potvin informed him that the sponsor of Indian Wells had some doubt as to plaintiff's suitability. Plaintiff also recalled the mailing of a letter by him to the sponsor to satisfy the income requirements. There can be no doubt that this exchange would have and in fact did put plaintiff on notice of the fact that his suitability may have been in issue. At that point, plaintiff had a duty to investigate the suitability issue and failed to do so. As noted by Judge Gibson in *Campbell v. Up-*

*john Co., supra,* 498 F.Supp. at 728: [I]f the plaintiff could have discovered his cause of action through due diligence, there is no need to grant him more time in which to act."

■ Further, plaintiff has failed to prove that the "facts" allegedly concealed were fraudulently concealed. The tolling concept is based on explicit, conscious deception, concealment and bad faith on the part of a defendant. *See Dyer v. Eastern Trust, supra,* 336 F.Supp at 901. For a plaintiff to assert fraudulent concealment, he must prove "that the wrongdoer has contrived to deceive his victim...." *Dabney v. Levy,* 191 F.2d 201, 204 (2d Cir.1951) (L. Hand J.) *cert. denied,* 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951). To prove fraudulent concealment plaintiff must identify affirmative acts of concealment continuing after the original wrong was complete. *Campbell v. Upjohn Co., supra,* 498 F.2d at 722. Plaintiff has not proven the existence of allegedly concealed facts, let alone Hutton's knowledge thereof. Accordingly, Hutton cannot be said to have fraudulently concealed facts from the plaintiff upon which his cause of action is based.

For the foregoing reasons, plaintiff has failed to prove that the one-year period of § 13 should be tolled. Accordingly, plaintiff's claim for an alleged § 12(1) violation was and is time barred.

E. ALLEGED VIOLATION OF § 410(a) OF THE MICHIGAN SECURITIES ACT, M.C.L.A. § 451.-810(a).

■ Plaintiff alleges further that the offer and sale to him of Indian Wells 1981–I constituted a violation of § 410(a)(1) of the Michigan Uniform Securities Act, M.C.L.A. § 451.810(a)(1). This section of the Uniform Act makes actionable a violation of § 301 of the Uniform Act, M.C.L.A. § 451.701, which prohibits the sale of an unregistered security in a non-exempt transaction. However, § 410(e) provides that "[a] person may not bring an action under this subsection (a)(1) more than two

years after the contract of sale." M.C.L.A. § 451.810(e). No dispute exists that plaintiff purchased his interest in Indian Wells on February 2, 1981, and commenced this action on June 23, 1983, outside the two-year period. Accordingly, absent a tolling, plaintiff's action under § 410(a)(1) is time barred.

Plaintiff argues in support of a tolling, that Hutton fraudulently concealed from him that he was unsuitable under Michigan law to receive the offer or the sale and, that as a result, the Indian Wells offering "lost" its exempt status under the Michigan Uniform Securities Act.

Tolling of the statute of limitation for fraudulent concealment is covered by M.C.L.A. § 600.5855 which states in pertinent part:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim ... from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim ... although the action would otherwise be barred by the period of limitations.

M.C.L.A. § 600.5855.

For essentially the same reasons previously discussed, plaintiff has failed to prove his right to invoke the above tolling provision. As under the federal tolling provision, plaintiff bears the burden of proving the concealment. *Dowse v. Gaynor*, 155 Mich. 38, 118 N.W. 615 (1908). Once again it follows, that plaintiff must bear the burden of proving the existence of the facts allegedly concealed. In this instance, plaintiff argues that Hutton concealed from him his lack of suitability under Michigan law and that because of his unsuitability, Indian Wells "lost" its exemption. Plaintiff must, therefore, prove that he was in fact unsuitable and that the Indian Wells Offering lost its exempt status. This plaintiff has not done.

Hutton's exemption from registration arises under § 402(b)(9) of the Uniform Securities Act. [M.C.L.A. § 451.802(b)(9)]. Subsection (b)(9)(D) of § 402 provides that in order to claim the § 402(b)(9) exemption, the offering must meet all the conditions of one of five separate sets of regulations. One of the separate "sets of regulations" is § 402(b)(9)(D)(5) which exempts (if all other conditions of § 402(9)(b) are met):

> (5) Sales made to a person who the seller has reasonable grounds to believe and does believe meets one of the following conditions:
>
> (i) A business entity having either (i) net income from operations after taxes in excess of $100,000.00 in its last fiscal year or its latest 12–month period, or (ii) a net worth in excess of $1,000,000.00 at the time of purchase, and after the purchase has less than 10% of its total assets invested in the securities of the issuer.
>
> (ii) An individual who after the purchase has an investment of more than $50,000.00 in the securities of the issuer, including installment payments to be made within 1 year after purchase by the investor; has either personal income before taxes in excess of $100,000.00 for his last fiscal year or latest 12–month period and is capable of bearing the economic risk, or net worth in excess of $100,000.00; and has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment or has obtained the advice of an attorney, certified public accountant, or investment advisor registered under the investment advisers act of 1940, or an investment adviser registered under this act, with respect to the merits and risks of the prospective investment.

Summarized, § 5(ii) exempts sales to individuals whom the seller reasonably believes:

1) has after the sale more than $50,000 invested in the issuer;

2) has either (a) personal income before taxes of greater than $100,000 in the last fiscal year or latest 12–month period and is capable of bearing the economic risk,

or (b) has a net worth in excess of $1,000,000; and

3) is sophisticated or has adequate investment advice from a sophisticated advisor.

Subsection 5(ii) does not set forth a suitability requirement for the receipt of offers but only for sales. Furthermore, the income requirement requires that the $100,000 income be realized in either the last fiscal year or latest 12–month period. The Indian Wells offering memorandum sets forth a sponsor requirement of income greater than $100,000 in the prior fiscal year and there is no mention that the income requirement can be met if $100,000 is received during the prior 12–month period. Indian Wells is free to set higher standards for itself but is bound only to the law. The issue of plaintiff's suitability under M.C. L.A. § 451.802 must be determined by reference to the statute as opposed to the Indian Wells offering memorandum itself.

Plaintiff apparently alleges that he did not meet the requirements as set forth by § 5(ii) and that as a result, Hutton lost its exemption. Plaintiff has not met his burden of proving that he was unsophisticated or unable to bear the economic burden of his investment. In fact, he concedes his sophistication to the contrary under the NASAA guidelines which parallel § 5(ii). Plaintiff's main focus is, of course, on the income requirements of the statute. Plaintiff alleges that he did not meet the requirement of making $100,000 in the "last fiscal year", i.e., 1980. However, as earlier pointed out this statement flies in the face of his letter to Indian Wells specifically stating his income in 1980 exceeded $100,000. However, the income requirement may also be satisfied upon receipt of income in excess of $100,000 in the "past 12 months" prior to the sale. Plaintiff has testified that he received a payment of over $230,000 from his professional corporation in January of 1981, i.e., within 30 days of his investment. As a result, plaintiff has proven his own suitability under Michigan law thereby mooting the concealment issue.

Furthermore, plaintiff has failed to meet his burden of proving that by virtue of his "unsuitability," the Indian Wells offering lost its exempt status under the Michigan Uniform Securities Act. Again, the issue is not an investor's suitability, but the issuer's and seller's reasonable grounds to believe that the plaintiff was suitable. Plaintiff has offered no evidence as to Hutton's or the sponsor's beliefs at the time of sale or the reasonableness of that belief. Absent proof that Hutton did not reasonably believe that plaintiff was suitable at the time of sale, plaintiff cannot now challenge the exempt status of the offering.

Finally, even if plaintiff is unsuitable pursuant to § 402(b)(9)(D)(5)(ii), there are four other subsections under § 402(b)(9)(D) under which the offering could be deemed exempt. In other words, to prove that the offering lost its exempt status, plaintiff would have to prove that Hutton and the sponsors did not comply with any of the provisions under § 402(b)(9)(D). This plaintiff has not done.

Accordingly, for the foregoing reasons, plaintiff has failed to prove the existence of the very facts allegedly concealed from him, namely that he was unsuitable, that Hutton knew he was unsuitable, and that Indian Wells program lost its exempt status. There being nothing to conceal, plaintiff cannot now successfully invoke his theory of fraudulent concealment.

Additionally, plaintiff has failed to prove that the "facts" allegedly concealed were fraudulently concealed. In the context of M.C.L.A. § 600.5855, fraudulent concealment means the employment of an artifice, planned to prevent inquiry or escape investigation and to mislead or hinder the acquirement of information regarding a cause of action. *Grebner v. Runyon*, 132 Mich App. 327, 347 N.W.2d 741 (1984).

For the foregoing reasons, plaintiff has failed to prove a claim under Section 410(a) of the Michigan Securities Act.

### F. ALLEGED FRAUD AND ALLEGED VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT.

Under Michigan Law, the standard of proof in proving fraud appears to be somewhat murky. *See dissent* in *Disner v. Westinghouse Corp.* 726 F.2d 1106 (6th Cir.1984). Regardless of whether the standard is by "fair preponderance of evidence" or as the majority in *Disner* asserts by "clear and convincing evidence". I am satisfied plaintiff has failed to prove his claim under either test. The general rule is that to constitute actionable fraud, it must appear: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that plaintiff suffered injury. *Candler v. Heigho*, 208 Mich. 115, 175 N.W. 141 (1919). *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich.App. 509, 309 N.W.2d 645 (1981); *Gorman v. Soble*, 120 Mich App. 831, 328 N.W.2d 119, (1982).

For the reasons previously stated, with respect to alleged Rule 10b–5 violation, the court is satisfied that plaintiff has not borne his burden of proving by clear and convincing evidence or by a preponderance of the evidence that material misrepresentations were made; that Hutton or Mr. Potvin acted knowingly or recklessly with regard to any material misrepresentation that may have been made; that plaintiff justifiably relied on any misrepresentation that may have been made; and that any loss suffered by plaintiff was as a proximate result of any misrepresentation that may have been made. Accordingly, plaintiff cannot recover for common law fraud.

The second sub-allegation of Count III is a claim for a violation of the Michigan Consumer Protection Act, § 3(1)(y), (bb) and (cc).

This act was instituted to punish unfair, unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce. The sections relied upon by plaintiff for his cause of action define such practices to include:

(y) Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

(cc) Failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.

With respect to § 3(1)(y), plaintiff has not proved the existence of oral representations of fact or that such representations if made were grossly inconsistent with the written agreements covering the investments. Finally, plaintiff has failed to prove that he was "promised" anything and the offering memoranda certainly cannot be construed "to promise" results in a positive manner.

With respect to § 3(1)(bb), plaintiff has failed to prove a misrepresentation of fact material to the transaction, or that any such misrepresentation was reasonably relied on. Plaintiff could not have reasonably believed any allegedly rosy predictions in the face of repeated warnings of "high risk" as contained in the offering documents.

And with regard to § 3(1)(cc) no omission of material facts have been proven.

For the foregoing reasons, plaintiff has failed to prove the requisite elements of a violation of the Michigan Consumer Protection Act.

### G. ALLEGED BREACH OF FIDUCIARY DUTY.

The essence of Counts IV and VI, is an allegation of breach of a fiduciary

duty owing to the plaintiff. In order to prove that Hutton is liable for this alleged misconduct and breach of fiduciary duty, plaintiff must show: that Hutton, through its broker, Joseph Potvin, had a duty to the plaintiff; that Hutton breached its duty; and that the plaintiff was injured as a proximate result thereof.

Upon the evidence presented, I have serious doubt that a fiduciary duty was owed by Hutton to plaintiff. Plaintiff was at all times pertinent to this inquiry and by all accounts and proofs an intelligent, inquisitive, and self-reliant man, inherently disinclined to relinquish his trust to anyone. Plaintiff independently investigated the oil and gas business prior to making his investments. Plaintiff reviewed and rejected numerous offerings made by Hutton. Decisions on investments were made by plaintiff, on his own, after careful review of the sponsors' materials. He repeatedly ignored Hutton's recommendations to seek additional financial advice. He continually sought additional data from Hutton of a highly technical nature. To now claim he blindly placed his trust in Hutton is contrary to the sworn testimony.

 Assuming that plaintiff did in fact repose his trust in Hutton, as a non-discretionary broker, Hutton would have the following recognized duties:

1. to recommend a security only after studying it sufficiently to become informed as to its nature, price and structure;

2. to carry out the customer's orders promptly in a manner best suited to serve the customer's interests as embodied in the customer's instructions;

3. to inform the customer of the risks involved in purchasing or selling a particular security;

4. to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security;

5. to not misrepresent any fact material to the transaction; and

6. to transact business only after receiving prior authorization from the customer.

*Leib v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 461 F.Supp 951 (E.D.Mich 1978).

Plaintiff has failed to carry his burden of proving that Hutton violated any fiduciary duty that may have been owed to plaintiff. The manner in which the broker is to perform these duties will depend to some degree upon the intelligence and personality of his customer. If the customer is uneducated or generally unsophisticated with regard to financial matters or incapable of understanding the transaction, the broker must define the particulars of the transaction more carefully and cautiously. However, if the customer fully understands the dynamics of the market or is personally familiar with the security or insists on making his own decisions despite information, such as plaintiff, the broker's explanation of the risks may be merely perfunctory. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* is an important and controlling case in this area.

In this action, plaintiff is an attorney and became knowledgeable in oil and gas investments during the time he made his investments. He received all offering materials prior to investment and he made his own investment decisions. On their part, Hutton and Mr. Potvin adequately investigated and became familiar with the nature of plaintiff's financial circumstances prior to plaintiff's investment. Hutton at all times followed plaintiff's instructions and otherwise met its responsibilities. The only evidence which plaintiff presented in support of his claim of breach of fiduciary duty was that Eric Dawe, his current account executive, who concluded that the eleven oil and gas investments were not suitable for plaintiff based on a reading of the complaint. Mr. Dawe never examined plaintiff's tax return. I have reviewed carefully Mr. Dawe's testimony and weighed it against other evidence in the case. Plaintiff has failed to prove by a preponderance of the evidence that defend-

ant breached any fiduciary duty owed to plaintiff. In any event, in a non-discretionary account the customer may not complain if he knowingly selects an investment. Stated simply, plaintiff has not proven that Hutton violated the fiduciary duty of a non-discretionary broker.

## H. ALLEGED BREACH OF CONTRACT.

 Plaintiff in Count V of his complaint alleges that Hutton breached a contract with him. In order to recover on this theory, plaintiff must prove (1) that a contract existed between the parties, (2) the terms of the contract, (3) that Hutton breached the contract, and (4) that the breach caused his injury.

 Plaintiff alleges that Hutton agreed to provide investment advice and corresponding investments that would defer tax liability. Even if a contract existed between the parties and I have some doubt about this, plaintiff has not met his additional burden of proving that Hutton in fact breached the terms thereof. Unquestionably, Hutton provided investment advice and investments that in fact provided the tax write-offs plaintiff sought.

## I. ALLEGED VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) 18 U.S.C. §§ 1961, *ET SEQ.*

In Count VI, plaintiff alleges that defendant Hutton violated 18 U.S.C. §§ 1961–1968, the Racketeer Influenced and Corrupt Organizations Act (RICO).

The act states in part that:
It shall be unlawful for any person who (1) through the commission of two or more acts (2) constituting a "pattern" (3) of "racketeering activity" (4) directly or indirectly invests in, or maintains an interest in, or participates in (5) an "enterprise" (6) the activities of which affect interstate foreign commerce.
18 U.S.C. §§ 1962(a)–(c) (1976)

The core violation of federal RICO is the acquisition or maintenance of ownership or control of, or conduct of or participation in, an enterprise in or affecting interstate commerce, if accomplished through a "pattern of racketeering activity.

The "pattern of racketeering activity" which plaintiff Platsis alleges that defendant Hutton was engaged in include:

—fraud. 18 U.S.C. 1961(1)(D)

—use of U.S. mail and facilities in interstate commerce for mail fraud. 18 U.S.C. 1961(1)(B)

—fraud in the sale of securities. 18 U.S.C. 1961(1)(D).

 In order to recover under RICO, plaintiff must prove by a preponderance of the evidence that Hutton through the commission of two or more acts constituting a "pattern" of "racketeering activity" directly or indirectly invested in, maintained an interest in, or participated in an "enterprise" the activities of which affect interstate commerce. *Sedima, S.P.R.L. v. Imrex, Co., Inc.,* —— U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346, 358–59 (1985).

 Plaintiff has the burden of proving by a preponderance of the evidence that the allegedly fraudulent predicate acts were at least two in number and related to an overall enterprise of defrauding him in connection with the claims asserted in this lawsuit. *Sedima v. Imrex, supra,* 105 S.Ct. at 3282, 3286; *Farmers Bank of Delaware v. Bell Mortgage Corp.,* 452 F.Supp. 1278, 1281 (D.Del.1978).

 Plaintiff must also establish a pattern of racketeering activities, i.e., a series of "predicate acts" which are sufficiently related to the current complaint as to be described as similar acts. *Sedima v. Imrex, supra,* 105 S.Ct. at 3285 n. 14. Absent proof of a "relationship" or "continuity" between the alleged predicate acts and the acts alleged in the instant complaint, a plaintiff lacks standing to complain under RICO. *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985); *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985).

**1310**

Plaintiff must also establish that Hutton, as the entity comprising the "enterprise," is distinct and unaffiliated from Hutton as a RICO defendant. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984); *Nunes v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 609 F.Supp. 1055, 1064 (D.Md.1985); *Lopez v. Dean Witter Reynolds*, 591 F.Supp. 581 (N.D.Cal.1984).

Plaintiff must also establish that defendant directly or indirectly invested in or maintained an interest in or participated in the conduct of the enterprises about which he complains. In this case plaintiff must prove that defendant and the various oil and gas companies operated as a unit. Since Hutton and the sponsors are distinct entities, this element cannot be satisfied. The enterprise must have a distinct structure separate from the pattern of racketeering. *U.S. v. Bledsoe*, 674 F.2d 647 (8th Cir.1982).

Plaintiff in this action has failed to prove fraudulent or predicate acts on the part of Hutton. Further, plaintiff has failed to prove that any fraudulent or predicate acts on the part of Hutton were related to an overall scheme to defraud the plaintiff. Likewise plaintiff has failed to prove any fraudulent or predicate acts were sufficiently related to the complaint so as to be described as "security violation." Further, no evidence establishes that Hutton invested or participated in an "enterprise." Accordingly, plaintiff cannot recover for an alleged violation of RICO.

### CONCLUSION

For all the reasons discussed above, a judgment of no cause for action is entered in favor of defendant and against plaintiff.