Donald G. and Yvonne M. HARNER, Daniel P. Bera, Lavern Booms, Raymond R. and Barbara J. Shideler, Douglas L. Miles, Martin Becker, Ben A. and Louise F. Bluestein, William E. and Diane W. Benton, Winston and Alice L. Bradshaw, Lila P. Adbani and Earl C. and Hazel M. Hart, individually and on behalf of all others similarly situated, Plaintiffs,

v.

PRUDENTIAL SECURITIES INCORPO-RATED; Prudential–Bache Leasing, Inc.; Bache Group, Inc.; Polaris Investment Management Corporation; and Polaris Aircraft Leasing Corporation, Defendants.

No. 90–71629.

United States District Court, E.D. Michigan, S.D.

Feb. 19, 1992.

Ronald A. Schy, Chicago, Ill., R. Bradley Lamber, Birmingham, Mich., for plaintiffs.

Gary M. Saretsky, Bloomfield Hills, Mich., Joseph S. Allerhand, New York City, Raymond W. Henney, Detroit, Mich., for defendants.

## AMENDED OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### INTRODUCTION

This matter is before the Court on the Defendants'[1] Motion to Dismiss the Complaint or, in the alternative, for Summary Judgment filed on October 3, 1990. The Plaintiffs responded on December 19, 1990. On January 16, 1991 the Defendants replied to the Plaintiffs' response.

The Court, upon the request of the parties, agreed to withhold decision on Defendants' motion pending decision in the United States Supreme Court of *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d

---

**1.** The Motion was filed by Defendants Polaris. On September 28, 1990, Defendants Prudential concurred in Polaris's motion. Unless other-

wise stated, all reference to Defendants will be to both Polaris and Prudential.

321 (1991). On June 20, 1991, the Supreme Court rendered its decision in *Lampf*. It held that a Section 10(b) claim must be asserted within one year after discovery of the facts constituting the alleged violation and within three years after the alleged violation occurred. As a result of the *Lampf* decision, the parties agreed that the Plaintiffs' Section 10(b) claim was barred, and this Court entered an Order dismissing Count I with prejudice on July 24, 1991.

The Court permitted the parties to file supplemental briefs specifically on the issue of whether the RICO claim was time-barred or legally deficient. Defendants Prudential and Polaris filed separate [2] supplemental briefs on this issue on July 19, 1991, and the Plaintiffs filed a response on August 6, 1991. Oral argument was heard on August 21, 1991.

Defendants make two claims in their motion. First, that the Plaintiffs' RICO claim is time-barred under the applicable statute of limitations. To determine this, the Court must decide whether the Plaintiffs knew or should have known of the alleged fraud within the RICO four year statute of limitations period. Second, that the RICO claim is legally deficient. The Court must determine whether the securities fraud claim, which serves as the predicate act for the RICO claim, fails to satisfy the elements of a section 10(b) claim [3] under Fed. R.Civ.P. 12(b)(6) and 56(c) and also fails to meet the pleading requirements of Rule 9(b).[4]

**FACTS**

Beginning in 1983 and through the end of 1984, Defendants marketed approximately $40.3 million worth of shares, or units, in four limited partnerships called Prudential–Bache/Polaris Aircraft Investors II–A, B, C, and D (the "Partnerships"). The Partnerships were organized to purchase, for lease and eventual resale, business aircraft, primarily turboprop and turbofan aircraft.

Plaintiffs are individual investors who reside in Michigan, New York, or Oklahoma. Each purchased units of limited partnership interest in one or more of the Partnerships. A unit cost $1000 each, and the minimum subscription was five units for a total investment of at least $5000.

Defendants Polaris Investment Management Corporation and Prudential–Bache Leasing, Inc. ("PIMC") are the general partners of each of the Partnerships. Defendant Polaris Aircraft Leasing Corporation is the parent company of PIMC. Defendant Prudential–Bache Securities, Inc. ("Prudential") allegedly marketed the Partnership units to the Plaintiffs. Defendant Bache Group, Inc. is simply identified in the Complaint as the parent company of Prudential.

According to the Plaintiffs, they purchased the limited partnership units upon the recommendation and representations of employees of Prudential and in reliance on a prospectus dated June 15, 1983 (the "Pro-

**2.** Defendants Prudential also concurred with Polaris's supplemental brief.

**3.** Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j prohibits "in connection with the purchase or sale of any security ... any manipulative device or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The Securities and Exchange Commission ("SEC") promulgated Rule 10b–5, which provides in relevant part:

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 .(a) To employ any device, scheme, or artifice to defraud, [or]

 \* \* \* \* \* \*

 (c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5 (1979). *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1406–07 (6th Cir.1991).

**4.** As the Defendants have presented, and the Court has accepted, materials outside the formal pleadings in this matter, the Court, in accordance with Fed.R.Civ.P. 12(b), will treat Defendants' motion as a motion for summary judgment under Fed.R.Civ.P. 56(c).

spectus") and an accompanying brochure (the "Brochure") prepared by the Defendants. Certain Plaintiffs were also given a copy of the "Fact Sheet" on their respective Partnerships that had been distributed to the brokers for internal use. The Plaintiffs allege, however, that the Defendants knew that this Fact Sheet was routinely sent by brokers to their customers, and that its content formed the basis for certain representations made to the Plaintiffs.[5]

In addition, other sales materials were utilized by the Defendants including a question and answer booklet, speeches for public seminars, invitations to attend seminars, letters to prospective investors, mailing cards, and audio-visual materials. (The Brochure, Fact Sheet, and all other sales materials except the Prospectus will hereinafter be collectively referred to as "sales materials.")

According to the Plaintiffs' Complaint, in the almost three years immediately prior to the offering of the Partnerships, the market for business aircraft, including turbofan and turboprop aircraft purchased by the Defendants for the Partnerships, suffered a severe downturn from which it has not recovered to this date. The Plaintiffs add that the Defendants were well aware of, or recklessly disregarded, the depth and severity of this slump.

The Prospectus, Plaintiffs say, contains numerous misstatements of material fact and fails to state a number of facts necessary to make those stated, in light of other circumstances, not misleading. The major alleged misrepresentation[6] is the failure to represent the extent of the devastation of the aircraft market. Although the Prospectus notes that the demand for aircraft is depressed, it fails to mention that the aircraft market was in what the Plaintiffs claim was its deepest recession ever.

The Fact Sheet as well, Plaintiffs claim, contains misrepresentations. For example, under the heading "Preservation of Capital," it states that "aircraft have historically high resale value," despite dramatic slumps in such values during the preceding three years. Moreover, projections in the Fact Sheet falsely state that re-lease rates of partnership aircraft are projected at approximately 94% of the original lease rates despite assumed decreases in the aircraft's value of 25 to 50%. This statement, contend the Plaintiffs, is erroneous in that aircraft that lose 25 to 50% of their resale value cannot be re-leased at 94% of the original lease rate.

As to the Brochure, the Plaintiffs contend that the graphs contained therein are misleading. The graphs purport to depict the used value of aircraft after ten years of service. The first graph shows the value of two planes, neither of which was ever purchased or, claim the Plaintiffs, intended to be purchased. The second graph shows the value of one plane, the Falcon 20. This plane was the only one of fifteen commonly-used business aircraft to experience an increase in value over the ten years (the Partnerships did not purchase a Falcon 20), and the other business aircraft lost as much as 25% of their value in the same period.

The Plaintiffs further allege that the Defendants attempted to fraudulently conceal

---

**5.** As this Fact Sheet was clearly intended for internal use, there is some uncertainty as to whether it can serve as a basis for a misrepresentation claim. *See generally Marlow v. Gold,* No. 89–8589, 1991 WL 107268, 1991 U.S. Dist. LEXIS (S.D.N.Y. June 13, 1991). The Plaintiffs claim, however, that because this Fact Sheet was disseminated to investors, with the Defendants' knowledge, and because there was no indication in the Prospectus that such materials as the Fact Sheet could not be relied upon, it should be able to serve as a basis for their claim. The Court need not, and will not, discuss whether the Fact Sheet served as a proper basis of reliance for the investors.

**6.** The Plaintiffs also allege several minor misrepresentations such as that the Defendants, contrary to their statement in the Prospectus, had no intention of acquiring or leasing commercial aircraft; that the Defendants did not first have a commitment to lease their aircraft from a third party, despite a statement to the contrary in the Prospectus; and, finally, that while the Prospectus claims that no aircraft had been selected for acquisition by any partnership, the Defendants had already ordered certain aircraft which they intended to and did place in the Partnerships.

their unlawful conduct from the Plaintiffs. They refer to two letters, dated October 15, 1985 and February 7, 1986, recounting the decline in the corporate aviation market and how it affected the Partnership. According to the Plaintiffs, the Defendants knew that the decline in the industry had begun as early as 1981 and reached an all-time low in 1983. Thus, these letters, Plaintiffs say, were not only false, but were designed to mask the falsehoods and omissions at the time the Partnerships were formed.

Finally, the Plaintiffs refer to a series of communications sent out in May 1986, July 1986, December 1986, February 1987, and August 1987, all referring to a weak market and expressly or impliedly claiming that such conditions became evident only after the Partnerships were formed, when in fact they had existed for at least two years prior to the formation of the Partnerships.

The "centerpiece" of the Plaintiffs' Complaint is that the Defendants represented in the Prospectus and sales materials that aircraft "retain high resale values" and that there was "an excellent market for releasing," the two primary objectives of the Partnerships. However, as the Defendants knew at the time, the aircraft industry was in extremely poor condition and their predictions were impossible to realize. As a result of these misrepresentations, Plaintiffs allege that they lost "substantially all of their monies invested." [7]

### STANDARD OF REVIEW

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases ushered in a "new era" in the standards of review for a summary judgment motion: *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). These cases, in the aggregate, lowered the movant's burden as to the demonstration that no genuine issue of material fact exists.[8] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.[9]

The Sixth Circuit expressly adopted this new era in a securities fraud/RICO case, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989). There the court delineated several principles, extracted from the Supreme Court trilogy, to guide trial courts in this circuit in deciding motions for summary judgment. Listed below are some of the relevant principles:

1. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

2. The movant must meet the initial burden of showing "the absence of a genu-

---

**7.** According to the Complaint, the Defendants raised approximately $5,063,0000.00 from the investors in Polaris IIA and paid out approximately $1,114,670.00 in dividends; Defendants raised approximately $10,485,000.00 in Polaris IIB and paid out approximately $1,417,000.00; Defendants raised approximately $7,878,000.00 from investors in Polaris IIC and paid out approximately $1,664,000.00; Defendants raised approximately $16,840,000.00 from Polaris IID and paid out approximately $5,613,000.00.

**8.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 29 (1991 Supp.).

**9.** In this instance, the Plaintiffs will eventually bear the burden of proof as to both the limitations period and the misrepresentation claim.

ine issue of material fact" as to an essential element of the non-movant's case.

3. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case.

4. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

5. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. *Street*, 886 F.2d at 1478–80.

The Court will decide the motion before it by applying these principles.

### STATUTE OF LIMITATIONS

It is undisputed that there is a four year statute of limitations period for civil RICO claims. *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). It is also undisputed that the limitations period in a fraud case accrues when the plaintiff discovers or should have discovered the alleged fraud.[10] *Hofstetter v. Fletcher*, 905 F.2d 897, 904 (6th Cir.1988). Finally, it is clear that the Plaintiffs completed purchase of the limited partnership units at issue more than four years prior to the commencement of this action.

The sole dispute on the statute of limitations issue, then, is the date on which the four year RICO period of limitations ac-

crued. The Defendants claim that it began to run when the Plaintiffs purchased their Partnership units, or, alternatively, when they received letters from the Defendants in October of 1985 and February and May of 1986—more than four years prior to the commencement of this action—informing them of the poor Partnership results. The Plaintiffs fail to allege when the claim accrued; they simply contend that there are legitimate inferences to be drawn from the facts which render summary judgment inappropriate.[11]

■ At the outset, the Court observes that where, as here, the underlying facts are undisputed, even factually-based issues may be decided as a matter of law. *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987); *Hirschler v. GMD Investments Ltd. Partnership et al.*, 1991 WL 115773 (E.D.Va.) at *6. The burden of demonstrating compliance with the statute of limitations is on the plaintiff who must show the court the point at which he knew or should have known of the fraud. *Platsis v. E.F. Hutton & Co., Inc.*, 642 F.Supp. 1277, 1292 (W.D.Mich.1986), *aff'd*, 829 F.2d 13 (1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 [12]; *Hirschler*, 1991 WL 115773 at *6. If this point is more than four years prior to the commencement of this litigation, June 8, 1990, then the action is barred and must be dismissed.

■ In determining whether the plaintiff in a fraud case should have known of the violation, a court may inquire whether the plaintiff was presented with evidence

---

**10.** The Plaintiffs conceded this in their December 18, 1990 response to the Defendants' Motion to Dismiss. They later alleged, in a July 2, 1991 letter, that their RICO claim does not begin until they were on notice of the damages that they had allegedly suffered. This, however, would be contrary to Sixth Circuit law and their own prior statement.

**11.** The Complaint states the following:

Until shortly before the filing of this Complaint when they consulted with present counsel, plaintiffs were unaware of any of the facts as described above [describing, generally, the state of the aircraft industry at and before time of purchase]. Plaintiffs could not have

discovered the untrue statements and omissions by the exercise of reasonable diligence until shortly before the filing of their claims in this action.

Though not stated explicitly, the Plaintiffs presumably learned of the alleged misrepresentations from their counsel.

**12.** "It is his [plaintiff's] burden to prove by a preponderance of the evidence that he did not discover and through the exercise of reasonable diligence could not have discovered that misrepresentations or omissions were made until some time within the twelve (12) months preceding the commencement of the action." *Platsis*, 642 F.Supp. at 1292.

suggesting the *possibility* of fraud. As stated by the First Circuit,

> Appellants need not, however, have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.

*Kennedy v. Josephthal and Co., Inc.*, 814 F.2d 798, 802 (1st Cir.1987). Similarly, the plaintiff need not have before him all the facts necessary to establish that a statement was untrue or omitted before the limitations period accrues. *Platsis v. E.F. Hutton & Co., Inc.*, 642 F.Supp. 1277 (W.D.Mich.1986) (citing, *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y. 1977)). Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice. *Platsis*, at 1291 (citing, *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 693 (8th Cir.1981)).

Most courts have employed what is effectively a reasonableness standard in assessing the state of the plaintiffs knowledge of the violation.

> In applying the rule requiring the exercise of reasonable care to discover the alleged fraud, we must assume that E.L. Gaudin was at least a person of ordinary intelligence.

*Gaudin v. KDI Corp.*, 576 F.2d 708, 713 (6th Cir.1978). *See also Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) ("The test as to when fraud should with reasonable diligence have been discovered is an objective one"); *Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608, 617 (S.D.N.Y.1990).[13]

However, the Western District of Michigan's decision in *Platsis* would appear to have been based on a modified objective standard. Although it used the reasonable person as the barometer, it imbued this reasonable person with the experience of the plaintiff then before it:

> Whether plaintiff should be suspicious is to be tested by whether a reasonable person with the same experience and background of the Plaintiff and with knowledge of the same facts as were known to the Plaintiff would be expected to be suspicious and to make inquiry.

*Platsis*, 642 F.Supp. at 1291 (citing *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y.1977)).

■ This Court does not find the *Platsis* standard to be wholly satisfactory. It appears to confound the objective and subjective standards for determining the level of knowledge expected of an investor. Rather, the Court prefers the test established in *Maggio* which it finds to be more consistent with prior case law. The First Circuit there instituted a two-part test to determine whether the plaintiff had reason to suspect fraudulent behavior. First, a court determines whether the investor was warned of the possibility of fraud. If so, it decides whether the investor exercised reasonable diligence in attempting to discover the fraud. The cause of action accrues when he *should have discovered* the alleged fraud.[14] The first part of the test is objective, the second is subjective:

> We have recently emphasized, moreover, that whether a plaintiff should have discovered the fraud "is an objective question" requiring the court to "determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." In contrast, the determination of whether a plaintiff actually exercised reasonable diligence

---

**13.** The Plaintiffs counter that the court in *Gaudin* placed "heavy emphasis" on the fact that the plaintiffs were not novices. The Plaintiffs also refer to the fact that the court in *Landy* seems to have considered the fact that the partnership was limited to persons having a net worth of $250,000. The Plaintiffs misconstrue these opinions. In both cases the courts clearly state that the test to be applied is an *objective* one. The observation that the investors were more savvy than average was just that, an observation, and did not change the standard applied by the courts.

**14.** Presumably, an investor could notice "storm warnings" and then diligently investigate only to be hindered in his attempt to discover the fraud. In such a case, under this test, the date of accrual would be prolonged.

requires a more subjective inquiry focusing upon the circumstances of the particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants.

*Maggio,* 824 F.2d at 128 (citations omitted). *See also Cook v. Avien, Inc.,* 573 F.2d 685, 696–97 (1st Cir.1978).

■ Thus, this test employs both objective and subjective components. Whether the facts were sufficient to raise the possibility of fraud will be determined by an objective standard. The sophisticated stockbroker and the uninitiated rube will both be judged by the same standard, i.e., the "reasonable investor" standard. However, on the issue of whether the investor exercised due diligence in verifying the existence of a fraud, the experienced investor and the neophyte are to be judged according to their abilities and the circumstances of the alleged fraud.

■ This Court, then, must decide (1) whether the "storm warnings" in this case were sufficient to alert a reasonable investor as to the possibility of fraud, and, if so, (2) whether, and when, the Plaintiffs exercised due diligence in attempting to determine the cause and scope of the fraud.

For purposes of this inquiry, the Court considers a "storm warning" any indication in either the Prospectus and related sales materials or other subsequent communications that could reasonably be considered contrary to the rosy predictions that the Plaintiffs claim were misrepresentations.[15]

15. These predictions include any oral representations made to the investors, as alleged in paragraph 13 of the Complaint, as well as any written representations in the Prospectus or sales materials.

16. Significantly, the first page of the Prospectus warns the investor against relying on any prediction of future results, stating as follows:
 THE USE OF FORECASTS IN THIS OFFERING IS PROHIBITED. ANY REPRESENTATION TO THE CONTRARY AND ANY PREDICTION, WRITTEN OR ORAL, AS TO THE AMOUNT OR CERTAINTY OF ANY PRESENT OR FUTURE CASH BENE-

■ Beginning with the Prospectus, the Court finds several indicia that could be considered sufficiently different from optimistic representations to put a reasonable investor on inquiry notice.[16] The Prospectus lists the objectives of the Partnerships: to acquire business and commercial aircraft; to obtain tax credits from such purchases that would be available to the limited partners; to derive income from leasing the newly acquired aircraft to third parties; and to realize gains upon the sale of aircraft owned by the Partnerships. It then expressly cautions that *"[t]here can be no assurance that the investment objectives of any of the Partnerships will be attained."* (Emphasis added.)

Next, under the section entitled "Investment Objectives and Policies" and the subsection on "Demand for Aircraft," the Prospectus makes the following observation:

Various factors have depressed the current level of demand for business and commercial aircraft. Among these factors are the recent high levels of interest rates, which adversely affect the ability of potential purchasers of aircraft to obtain needed financing, depressed corporate profits resulting from the current recession, which has resulted in corporations reducing their capital expenditures and cutting back on their use of private aircraft, and the current shortage of qualified air traffic controllers, which has resulted in the imposition of significant restrictions on flight scheduling. *There can be no assurance that these or other factors will not continue to depress the demand for aircraft in the future.* (Emphasis added.)[17]

FIT OR TAX CONSEQUENCE WHICH MAY FLOW FROM AN INVESTMENT IN ANY PARTNERSHIP IS NOT PERMITTED.

17. The Prospectus continues by listing, in detail, the various factors which could affect the demand for aircraft:
 The demand for business and commercial aircraft in general may be affected by a number of factors, including such factors as general business conditions, conditions in the credit market, the cost and availability of fuel and alternative means of transportation, traffic levels of commercial operators, costs of air transportation, government regulations (par-

Under the next subsection entitled "Competition," the Prospectus notes that "[t]he aircraft leasing industry is highly competitive, offering users alternatives to the purchase of nearly every type of aircraft." It goes on to explain that

> [m]any of these competitors have significantly greater financial resources than the Partnerships and considerably greater experience than the General Partners and their Affiliates in managing, leasing, operating and selling aircraft.

Finally, the subsection entitled "Future Values of Used Aircraft" states that

> [f]uture ("residual") values of used aircraft may be affected by various factors that cannot be predicted such as the rate of inflation, the costs of materials and skilled labor, technological advances in the construction of aircraft and regulatory and industry standards applicable to aircraft manufacturers.

In sum, these disclaimers describe an uncertain and potentially difficult investment. They are sufficiently contradictory with, among others, the claim that there exists "an excellent market for re-leasing aircraft" to put a reasonable investor on notice.

On the first page, in bold type and capitalized, is the following admonition:

> **THE SECURITIES OFFERED HEREBY ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THE RISKS ASSOCIATED WITH THIS OFFERING ARE REFERRED TO ON THE FOLLOWING PAGE AND ARE DESCRIBED IN**

> ticularly those imposing environmental, maintenance and other requirements on the operation of aircraft and those which result in increased costs for the use of airports and airway facilities by business and commercial aircraft), airport curfews and other governmental restrictions, the ability of airports and air traffic control systems to accommodate additional business and commercial flights, the availability of pilots, technicians and maintenance personnel capable of meeting the strict certification requirements of the FAA, market conditions which may reduce or increase the supply of new aircraft, developments in technology or improvements by airframe, engine and avionics manufacturers,

**THIS PROSPECTUS IN THE SECTION ENTITLED "RISK FACTORS."** The Prospectus later sets forth a detailed discussion of fourteen separately identified risks relating to aircraft ownership and leasing, including (a) general business risks such as "fluctuations in general business and economic conditions" which could impact the aircraft business; (b) risks relating to the Partnerships' plan to borrow funds to purchase aircraft; (c) risks relating to the Partnerships' plan to lease their aircraft under short term leases in order to qualify for tax credits; and (d) risks relating to the "residual value" of the aircraft, *i.e.*, the amount which the Partnerships could realize by selling the planes.

The Court believes that these warnings, if read with the care they call for, were so specific and comprehensive as to indicate to a reasonable investor that additional inquiry would be necessary, even absent any indications by the Defendants that the market outlook was optimistic.

On page three, the Prospectus says that "the suitability of a purchase of units for any particular investor will depend upon, among other things, such investor's investment objectives and *such investor's ability and willingness to take risks.*" (Emphasis added.)

Under the heading, "Investor Suitability Standards," the Prospectus lists several conditions imposed on the investor including "Substantial Means and Net Worth" and "Ability and Willingness to Accept Risks."[18] The section on "Substantial Means and Net Worth" reads, in relevant part:

> and legislative and regulatory changes affecting costs and benefits of owning or operating aircraft. The demand for business and commercial aircraft may, in addition, be adversely affected by technological improvements in the telecommunications industry which decrease the necessity for business travel.

18. To invest in the Partnerships, an investor had to execute the "Subscription Agreement" which was attached to the Prospectus. In executing the Subscription Agreement, the subscriber acknowledged, among others things, that he had received the Prospectus and all its supplements, and that he had satisfied the suitability standards.

*The purchase of Units is suitable only for investors who have no need for liquidity in this investment and who have adequate means of providing for their current needs and contingencies.* Accordingly, Units generally will be sold to a prospective investor only if he represents in writing that he either: (i) has a net worth (exclusive of home, home furnishings and personal automobiles) which exceeds the aggregate price of the Units for which he has subscribed by at least $30,000, and expects to have, during each of the current and the next three tax years, gross income from all sources in excess of $30,000; or (ii) has a net worth (exclusive of home, home furnishings and personal automobiles) which exceeds the aggregate price of the Units for which he has subscribed by at least $75,000. (Emphasis added.) [19]

At least implicit, if not explicit, in this caveat is the understanding that an investor may lose his entire investment and should be prepared to absorb this loss. Again, a reasonable investor receiving this information would be on notice to engage in further investigation.

▇ But even if the warning signals in the Prospectus and the sales materials were not sufficient, the Defendants sent letters to the Plaintiffs in October 1985 and February and May 1986 (more than four years before the present action) alerting them to the poor partnership results, reduced (and ultimately suspended) cash distributions, and extremely poor market conditions. The October 15, 1985 letter accompanied the third quarter Partnership cash distribution which, the letter notes, had been reduced from the prior quarter's distribution. The letter addresses the poor conditions in the corporate aviation market due to oversupply and current tax proposals and resulting uncertainty in the market: "This uncertainty has made potential buyers hesitant and has had an extremely negative impact on the corporate aviation industry." The February 7, 1986 letter was an interim letter informing the investors of further bad news:

As evidenced by the attached status report and as discussed in previous communications, you will note that the partnership continues to encounter a deteriorating corporate aircraft leasing market. Although normally we would expect to release the equipment on the same or comparable lease term, this is not the case given today's market conditions.

Even if the Plaintiffs allege that they were not on notice at the time of purchase, upon receipt of these letters, they were undeniably on notice that their investment was failing and that further investigation was necessary.

The precise reason why the Plaintiffs waited more than four years after purchasing the partnership units and receiving the above letters to bring a lawsuit against the Defendants is unclear. What is clear, however, is that the Plaintiffs, long before the filing of the Complaint, had in their possession information sufficient to begin a due diligence investigation into the purported fraud.[20] That they did not is fatal to their present claim.[21] The Court finds that the fraud claim is barred by the four year RICO limitations period.

Three recent district court opinions share many facts with the present case. In *Platsis v. E.F. Hutton & Co., Inc.*, 642 F.Supp.

---

**19.** At oral argument, the Plaintiffs' counsel argued that the Plaintiffs were persons of moderate means, pointing to the fact that, to invest, they were required to have an income of only $30,000. This is only partly true. The Plaintiffs had to certify that they had an annual income over $30,000 *and* that, exclusive of home, home furnishings and personal automobiles, they had a net worth of at least $30,000 more than the amount invested in the Partnerships.

**20.** "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how

his investment turns out before he decides to invoke the provisions of the Act." *Hirschler v. GMD Investments Ltd.,* 1991 WL 115773 (E.D.Va.) (quoting *Stull v. Bayard,* 561 F.2d 429, 433 n. 4 (2d Cir.1977), quoting *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 213–14 (9th Cir.1962)).

**21.** There is no evidence in the record that, upon receiving inquiry notice, the Plaintiffs made any effort whatsoever to investigate the Partnerships. In fact, there is no evidence of a due diligence investigation at any time prior to the commencement of the lawsuit.

1277 (W.D.Mich.1986), the plaintiff purchased interests in oil and gas limited investments as tax shelters. When the investments went bad, the plaintiff sued claiming that the defendant made verbal misrepresentations and omitted to disclose to the plaintiff that the investments were disasters from the beginning. More particularly, the plaintiff charged that his broker promised him "guaranteed" returns. The court rejected the plaintiff's claim on the ground that it was time-barred by the statute of limitations. The plaintiff should have known when he received the offering materials "that any suggestion of a promised return, if actually made, was made without any factual basis, was of questionable merit and potentially false." *Platsis*, 642 F.Supp. at 1292.

The Plaintiffs contend that *Platsis* is distinguishable from the instant case. In *Platsis*, the court found that the representations were directly contradictory; the court there also found that the plaintiff was a sophisticated investor. Here, in contrast, the representations were not *directly* contradictory and the investors were not sophisticated. Both these contentions are unconvincing.

First, the *Platsis* court described, on the same page of the opinion, the necessary degree of contradiction needed to trigger inquiry notice in three different ways: "directly contradictory," "contradictory," and "wholly inconsistent." *Platsis*, 642 F.Supp. at 1292. It is clear from the context of the opinion that the applicable standard is the degree of inconsistency that would alert a reasonable investor to the fact that there is a possibility of fraud and the need to exercise due diligence so as to determine whether or not a fraud actually exists. To focus exclusively on the word "directly" is to confuse semantics with substance. The relative sophistication of the investors is another red herring. The determination as to whether an investor has received inquiry notice is made using an objective standard. Regardless of the sophistication of the investor, he will be held to the standard of the reasonable investor.

In *Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608 (S.D.N.Y. 1990), citizens of fourteen different states invested in four limited partnerships to market a product designed to recycle and reclaim used lubricating oils. The investments ranged from $15,000 to $100,000. The purpose of the partnerships was to reap the potential tax advantages from the probable loss to be suffered during the first few years of the partnerships. Potential investors were repeatedly warned in the offering memoranda that the partnerships were risky and the potential for profit was speculative. In fact, the memoranda cautioned, in bold type, that the Internal Revenue Service might disallow all or a portion of the deductions claimed by the partners. Finally, the offering memoranda indicated that potential investors in the partnership should have a liquid net worth of at least $250,000 and annual income placing them in the tax bracket then taxed at a 49% marginal rate.

Each investor signed a subscription agreement certifying that he had carefully reviewed the offering memorandum, the partnership agreement, and the subscription agreement. Each also certified that he had the requisite financial acumen to understand the offering memoranda and that he understood the risks inherent in the partnership.

Three years after the formation of the partnerships, the IRS disallowed all income tax deductions claimed by the partners. The investors sued, charging that the defendants represented that the partnerships had profit potential when the defendants knew or should have known that in fact there was absolutely no possibility of the partnerships ever showing a profit.

The court held that the limitations period accrued when the investors purchased the partnership units. It found that while the inconsistencies were not immediately revealed on the face of the offering materials, an investigation by the plaintiff would have revealed the alleged misstatements:

> Plaintiffs' argument that this lack of direct disclosure in the offering memoranda frees them from the obligation to

have discovered the fraud at the time of purchase might succeed, if the law placed no duty of inquiry on plaintiffs. But the law is not so forgiving, particularly where, as here, plaintiffs certified by their purchase that they were sophisticated investors who had knowledge of the offering materials.

*Landy*, 734 F.Supp. at 617. The court added that while the denial of deductions was clearly the factor that precipitated the lawsuit, there was no change in circumstance between the purchase of the partnerships and the denial which could have served as further indication that something was amiss. The court concluded that the fact that the investors waited until their investment turned sour could not protect their cause of action.

 The Plaintiffs attempt to distinguish their case from *Landy* by noting that the specific flaws in the *Landy* partnership were clearly spelled out on the face of the offering materials. While this is true as to a similar case, *Bender v. Rocky Mountain Drilling Assocs.*, 648 F.Supp. 330 (D.D.C. 1986), it is not true as to *Landy:*

> The Court agrees with plaintiffs that, unlike the situation in *Bender*, all the allegations of fraud in the instant action were not immediately revealed on the face of the offering materials.

*Landy*, 734 F.Supp. at 617. Thus, *Landy* stands for the proposition that even when the fraud is not apparent on the face of the offering materials, the investor may still be on inquiry notice.

The Plaintiffs further observe that the *Landy* partnerships required the investors to have a net worth of at least $250,000 and annual income placing them in the 49% tax bracket while the instant Partnership requirements "were a small fraction" of that. The Plaintiffs, however, misstate the facts. The instant Partnerships require a minimum net worth of $30,000 more than the cost of the units purchased, exclusive of home, home furnishings, and personal automobiles. The *liquid* net worth in the in-

stant case, then, would result in a figure much closer to that used in *Landy*. When one considers that the minimum investment in *Landy* was $15,000 as compared to $5000 here, it is clear that the investor suitability standards in the two cases are relatively analogous. But, even if the two cases did have wildly disproportionate net worth requirements for investor suitability, the underlying point is still the same: investors should be prepared to lose their entire investment.

In *Hirschler v. GMD Investments Ltd.*, 1991 WL 115773 (E.D.Va.), the plaintiffs invested in a real estate limited partnership as a tax haven. When the partnership failed to meet the projected levels of income, the plaintiffs, claiming they were defrauded by virtue of certain allegedly fraudulent statements and misrepresentations in the offering memorandum, sued. The court held that the repeated information that the investment was not operating as expected coupled with the clear warnings of risk in the offering memorandum served to give the plaintiffs inquiry notice. As early as one year after purchase, the investors were informed that their investment was not performing well, including information that the tax loss would be greater than expected and the projected cash distribution would not be made. As for the risk disclaimers,

> *When an investment so clearly proclaims its risks, as well as its potential rewards, a plaintiff cannot hide behind alleged ignorance and lack of need to investigate.* The offering memorandum openly invited, indeed encouraged investigation.

*Hirschler*, 1991 WL 115773 at *7 (quoting *Landy*, 734 F.Supp. at 618) (emphasis added). The court added that, even armed with this inquiry notice, the plaintiffs failed to take any investigatory action until their investment "began to turn against them, at which time they began to look for someone to blame." *Id.*[22]

22. As support for its contention that the plaintiffs failed to exercise due diligence, the court observed that the plaintiffs did not hire an ex-

pert to determine the accuracy or reliability of the projections. *Hirschler*, 1991 WL 115773 at *7.

The Plaintiffs contend that *Hirschler,* too, is distinguishable from the instant case. In *Hirschler,* the misrepresentations concerned the future performance of the partnership, while here, the misrepresentations concerned the true state of the aircraft market at the time of the investment. This distinction misses the point, which is that the particular risk assumed here was red-flagged. As noted *supra,* there was an abundance of cautionary warnings as to the dicey nature of the aircraft lease market in the Prospectus.

The Plaintiffs also assert that subsequent declines in an investment's value—as signalled by the letters—do not constitute inquiry notice when an alternative factor provides the explanation for the decline. They refer the Court to three Ninth Circuit cases: *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984); *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301 (9th Cir.1982); *Briskin v. Ernst & Ernst,* 589 F.2d 1363 (9th Cir.1978).

In these three cases, however, the plaintiffs had little evidence of fraud outside of the declining financial health of the defendants. Upon such tenuous information, the courts refused to find, as a matter of law, that the limitations period had accrued. In the instant case, however, it was not simply the ailing financial condition of the Partnerships that should have alerted the Plaintiffs to difficulties, but rather the incongruence between the representations of the brokers and the reality of the disclaimers in the Prospectus and sales materials.[23]

█ The Plaintiffs allege that the Defendants fraudulently concealed their misrepresentations by sending account statements through 1988 or later. These account statements, Plaintiffs say, served to lull the Plaintiffs into believing that the poor performance of the Partnerships was due to the market conditions as opposed to the Defendants' initial misrepresentations, and, hence, served to fraudulently conceal the misrepresentations thereby tolling the statute of limitations.

█ Three elements must be established with particularity before the doctrine of fraudulent concealment will apply:

(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.

*Campbell v. UpJohn Co.,* 676 F.2d 1122, 1126 (6th Cir.1982).[24] First, the argument that letters describing the deteriorating condition of the aircraft market constitute wrongful concealment is difficult to accept. If anything, such letters should logically call seriously into question any earlier representations by the Defendants that the Plaintiffs could expect their capital to be secure and anticipate a steady stream of income because there was "an excellent market for re-leasing aircraft." Second, as noted above, there is little in the record to indicate that the Plaintiffs exercised any due diligence until well after the warning signals. In fact, until they filed a lawsuit, it appears that the Plaintiffs took no action whatsoever to discover whether they had been the victims of fraudulent conduct.

### RICO CLAIM

█ Although the RICO claim is time-barred, the Court believes that it would fail on substantive grounds as well.[25]

---

**23.** The Court also notes, in passing, that the Ninth Circuit cases were decided before the advent of the new era in summary judgment discussed *supra.*

**24.** The party claiming fraudulent concealment bears the heavy burden of pleading and proving the applicability of the doctrine. *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230, 233 (6th Cir.), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

**25.** The fraud claims alleged by the Plaintiffs can conveniently be divided into two categories. First, those claims that allege that the Defendants, while aware that the market was in a slump, recklessly or intentionally misrepresented that the current and future prognosis for business aircraft was favorable. This is the major allegation of fraud in the Complaint. Second, those claims that certain portions of the Prospectus or sales materials misrepresented the manner in which the Partnerships were to

As the Plaintiffs allege that the Section 10(b) claim is the predicate act for the RICO claim, the RICO claim is valid only to the extent that the Section 10(b) claim is valid.[26]

The Sixth Circuit recently set forth the elements of a violation of § 10(b) of the Securities Exchange Act:

> To establish a violation of a § 10(b) of the Securities Exchange Act, plaintiff has the burden of establishing that this alleged misrepresentation about taking the same deal was (1) one of material fact, (2) made with scienter, (3) *on which plaintiff reasonably relied,* (4) which proximately caused plaintiff's injury.

*Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1409 (6th Cir.1991) (emphasis added). *See also Levin v. Arneault,* 1989 WL 223014, 1989 U.S. Dist. LEXIS 17056 (W.D.Mich. Dec. 22, 1989); *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 493 (6th Cir.1990). Although the Plaintiffs have difficulty satisfying the first, second, and fourth elements of the above test, the Court finds their discussion of the third element, reasonable reliance, to be particularly suspect. The Plaintiffs have failed to allege reasonable reliance on the alleged misrepresentations in the Defendants' Prospectus and sales materials.

The Complaint alleges, essentially, that the Defendants, knowing that the aircraft market was very bad, marketed limited partnership units to the Plaintiffs with promises of favorable returns. In support, the Plaintiffs provide evidence that the aircraft market had been in a slump since the early 1980s—years before the Partnerships offering. The negative state of the market combined with the positive predictions, the Plaintiffs say, induced them to invest their money unprofitably.

As noted in the above section on the limitations period, however, the Prospectus contains numerous cautionary notices, not only as to the depressed state of the market but also as to the general risk of the investment.[27] For example, the Prospectus notes that

> While this claim may have more validity than the prior accusation, it is far from sufficient to constitute an actionable charge of misrepresentation. First, it is, to an extent, taken out of context, in that the section in which it is found concerns the Partnerships' *intended* use of acquired aircraft. Second, the Prospectus warns in several places that the objectives, such as this one, would not necessarily be attained. Third, it is contradicted somewhat by other statements in the Prospectus that the Partnerships would lease aircraft back to the manufacturers.

The other minor allegations of fraud are of the same ilk. The Court finds that none reaches the materiality necessary to sustain a charge of misrepresentation. *See Platsis,* 642 F.Supp. at 1293 ("[a] fact is 'material' if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision").

---

be handled. These are the minor allegations of fraud. (For a description of these allegations see *supra* n. 6.)

As the Court finds that none of the minor allegations of fraud has merit, it will not discuss them in the body of the Opinion. Two examples should serve to demonstrate their lack of substance.

In paragraph 24 of the Complaint, the Plaintiffs refer to the Prospectus statement that the Partnerships intend to acquire new and used business and commercial aircraft. The Plaintiffs complain that commercial aircraft were not acquired and, thus, that they were misled by the Defendants.

First, this statement is located in that section of the Prospectus dealing with investment objectives. In that section and elsewhere, the Prospectus notes that there can be no assurance that the objectives will be obtained. Second, the statement concerns only the *intent* of the Partnerships, and not any concrete promise as to an action or result. To base an accusation of fraud on a loose statement of intent is disingenuous at best.

In paragraph 25 of the Complaint, the Plaintiffs refer to that portion of the Prospectus that reads as follows: "No Partnership will acquire any Aircraft unless it has first obtained a commitment from a third party to lease the Aircraft from the Partnership." The Complaint alleges that instead of being leased to third parties, the aircraft were leased back to the manufacturers.

**26.** As the mail and wire fraud claims, which also serve as predicate acts, are comprised of essentially the same elements as the securities fraud claim, the Court deems the Section 10(b) claim to be dispositive as to the mail and wire fraud predicate acts as well. *See United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1187 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).

**27.** The various disclaimers contained in the Prospectus are discussed more fully *supra* at 634–636.

[v]arious factors have depressed the current level of demand for business and commercial aircraft. ... There can be no assurance that these or other factors will not continue to depress the demand for aircraft in the future.

Also, the first page of the Prospectus states that

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THE RISKS ASSOCIATED WITH THIS OFFERING ARE REFERRED TO ON THE FOLLOWING PAGE AND ARE DESCRIBED IN THIS PROSPECTUS IN THE SECTION ENTITLED "RISK FACTORS."**

These warnings would alert any reasonable investor to the possibility of loss in the investment and the need to use caution when committing finances to the Partnerships. In reference to similar statements, the Second Circuit said that "[w]e are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.'" *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986).

■ In their briefs and at oral argument, the Plaintiffs complained that the Defendants did not adequately set forth the risks and problems besetting the aircraft leasing market at that time of their investment. However, the law does not require that offering materials denigrate the value of the investment or otherwise emphasize the poor condition of the market. *See Rodman v. Grant Foundation,* 608 F.2d 64, 71–72 (2d Cir.1979); *Hecco Ventures v. Avalon Energy Corp.,* 606 F.Supp. 512, 519 (S.D.N.Y.1985) ("[t]he material facts were disclosed, and the parties had no obligation to offer additional speculations."). Once the basic facts have been disclosed, it is the responsibility of the investor to decide the relative merits of the investment. *Aschinger,* 934 F.2d at 1410 (quoting *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (" 'general principals of equity suggest that only those who have pursued their own interest with care and good faith should qualify for

the judicially created private 10b–5 remedies' ").

■ Similarly, the Defendants were not required to condescend to the Plaintiffs. The law assumes a certain level of comprehension and judgment among investors. *See Consol. Goldfields, PLC v. Anglo Am. Corp.,* 713 F.Supp. 1457, 1470 (S.D.N.Y. 1989) ("corporations are not required to address their stockholders as if they were children"); *Richland v. Crandall,* 262 F.Supp. 538, 554 (S.D.N.Y.1967) (same). This is especially true in the instant case as the potential investors were required to attest to their net worth and ability to accept risks, thereby implicitly acknowledging their ability to read critically the Prospectus and other sales materials.

In sum, there was no reasonable reliance by the investors on the Defendants' representations sufficient to support a claim of misrepresentation. The Prospectus and other sales materials made clear that the investment was risky and that the aircraft market was unfavorable. Nothing more was required of the Defendants.

In *Brown v. E.F. Hutton Group,* 735 F.Supp. 1196 (S.D.N.Y.1990), the court was faced with a similar issue. The partners invested in a limited partnership designed to produce income through the purchase and management of oil and gas properties. The plaintiffs there alleged that the defendants knew or were reckless in not knowing that the partnership never had any chance of success despite representations that it was a low risk investment that would generate a steady stream of income. The plaintiffs received either zero or minimal returns.

The court granted the defendants' motion for summary judgment. It found that, as a matter of law, the offering materials were not misleading. The court set forth the various cautionary disclaimers including those attesting to the risk of the investment and the uncertain nature of the oil and gas properties market. After noting that it had to consider the total mix of information possessed by the investors, *Brown,* 735 F.Supp. at 1201 (quoting *Diamond v. Arend,* 649 F.Supp. 408, 415

(S.D.N.Y.1986)), the court concluded that any investor who relied on statements attesting to the low risk of the investment did so unreasonably:

> In sum, the offering materials are replete with statements emphasizing the speculative nature of the investment. Anyone who had taken even a cursory glance at the Prospectus and Supplement would have been alerted to the many risks and uncertainties inherent in the investment. Thus the written offering materials given to plaintiffs are not misleading within the meaning of Section 10(b).

*Brown,* 735 F.Supp. at 1201. *See also Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir.1991) (although optimistic, the offering materials clearly warned investors in a meaningful way that economic conditions in the horsebreeding industry were uncertain).

As in *Brown,* the Plaintiffs in the instant case were given abundant warning that their investment was speculative and risky. They knew or should have known that the market was depressed and that competition was keen. To the extent that they relied on prognoses, written or oral, that the market was good and that they were assured a steady stream of income, this reliance was unreasonable in the context of the mix of information available to them.[28]

### DISMISSAL OF THE PENDENT CLAIMS

 With the RICO claim dismissed, the basis for federal court jurisdiction is lost, and the Court must decide what to do with the remaining state law claims of fraud (Claim II)[29], negligence (Claim III), and fiduciary duties (Claim IV).

**28.** The Plaintiffs claim that the instant case is "fundamentally different" from *Brown.* As support, they allege that in *Brown* there were no "specific misrepresentations" whereas here there were. The Court finds this distinction unpersuasive. Both in *Brown* and the instant case, the defendants allegedly promoted their investments by claiming that they would generate a steady stream of income. Moreover, the statements in *Brown* that the partnerships featured "Regular Cash Distributions," "No Exploration Risk," and "Low Minimum Investment" are not substantially removed in tone or content

The Sixth Circuit has stated that the Court's discretion to retain pendent jurisdiction over state law claims once the federal claim which originally formed the basis for federal jurisdiction has been dismissed is extremely limited:

> [I]t is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed. A trial court must balance the interests in avoiding needless state law decisions discussed in *United Mine Workers* [*v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] against the "commonsense" policies of judicial economy discussed in *Rosado,* [*v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970)] when deciding whether to resolve a pendent state claim on the merits.

> Through a series of cases following *United Mine Workers,* [*v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] this circuit has adopted the position that the district courts have minimal discretion to decide pendent state law claims on the merits once the basis for federal jurisdiction is dismissed before trial. However, in certain cases, the overwhelming interests in judicial economy may still allow a district court to properly [sic] exercise its discretion and decide a pendent state law claim once the federal claim is dismissed before trial.

*Province v. Cleveland Press Pub. Co.,* 787 F.2d 1047, 1055 (6th Cir.1986).

In *Province,* the court held that there was substantial similarity between the factual findings necessary to the resolution of the state and federal law claims. Thus, considerations of judicial economy coun-

from the instant alleged proclamations that aircraft "retain high resale value" and that there was "an excellent market for re-leasing."

**29.** As noted by Plaintiffs' counsel at oral argument, the state law claims of one Plaintiff are not time-barred under the Michigan and New York statutes of limitations. As noted below, however, the Court believes that, as with the federal RICO claim, the Plaintiffs have not satisfied the elements of their state law claims.

seled for a resolution of the pendent state claims even though the federal claims had been dismissed.

This case presents a similar situation. As noted above, the predicate act of the RICO claim was an alleged Section 10(b) federal securities fraud violation. The factual issues underlying this fraud claim are, of course, analogous to those underlying the common law fraud claim. In both instances, the Plaintiffs claim that the Defendants represented that the market for releasing aircraft was favorable despite knowledge that it was in very poor condition.

The legal issues are likewise analogous. In both the federal and state fraud claims, the essential elements are as follows: material misrepresentation or omission; recklessness or intent to defraud; reliance by the victims; and injury.[30] More importantly, an essential element of both § 10(b) and common law fraud is reasonable reliance.[31] As noted above, the Plaintiffs' reliance was clearly not reasonable. Therefore, it would ill serve judicial economy to remand the common law fraud claim to the state court system where the same factual and legal issues will have to be considered anew.

■ The Court has already found that the Plaintiffs have not raised a genuine issue of material fact sufficient to withstand the Defendants' Motion for Summary Judgment on the predicate act of their RICO claim. It similarly finds that the Plaintiffs have failed to make a satisfactory claim under the elements of their common law fraud claim.[32]

## CONCLUSION

The contrast between assurances of retention of value and a steady stream of capital and dire prognostications in the Prospectus should have put the investors on notice that there was a potential problem with their investment. At this point, the law imposed on them a duty to exercise due diligence in an attempt to determine if a fraud really existed. The Plaintiffs failed to take any action to verify the suspicions that should have been aroused. On this basis, the Court is unable to find that the Plaintiffs have satisfied their burden of demonstrating that their suit falls within the relevant limitations period.

Moreover, as to the RICO claim, the Court finds that the Plaintiffs have failed to prove reasonable reliance on the Defendants' alleged misrepresentations sufficient to support the underlying fraud claim.

In conclusion, as to both the statute of limitations and the fraud issues, the Court finds that, as a matter of law, the Plaintiffs have submitted little or no valid evidence to

---

**30.** As stated by the Michigan Supreme Court:

> " 'The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.' "

*U.S. Fidelity and Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77 (1981). *See also McDonald v. Gilbert Humphries, Jr.,* 810 P.2d 1262 (1990); *Barclay Arms, Inc. v. Barclay Arms Assoc.,* 74 N.Y.2d 644, 542 N.Y.S.2d 512, 540 N.E.2d 707 (1989).

**31.** *See e.g., McCoy v. Hilliard,* No. 90–5532, 1991 WL 132522 at *9, 1991 U.S.App. LEXIS 17760 at *25 (6th Cir. July 19, 1991) [940 F.2d 660 (table)] (unpublished opinion) ("An essential element under either the Security Act or for com-

mon law fraud, is the reasonable reliance by the plaintiffs on the alleged misrepresentations and/or material omissions for which defendants are responsible"); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 971 (2d Cir. 1987) ("The elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff").

**32.** As for the Plaintiffs' claims of Negligence and Fiduciary Duties, the Court observes that they essentially restate the fraud claim: "Defendants failed to use reasonable care in ascertaining and representing completely and accurately the true facts regarding the investments;" "The misrepresentations and omissions described above [in the Complaint] constituted a breach of their [Defendants'] fiduciary duties to plaintiffs and the class." Therefore, for the same reasons that the Court dismisses the Plaintiffs' fraud claim, it likewise dismisses their negligence and fiduciary duties claims.

support the essential elements of their claims. As such, these claims are unable to survive a motion for summary judgment. *See Street,* 886 F.2d at 1478–80.[33]

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Defendants' Motion to Dismiss the Complaint or, in the alternative, For Summary Judgment be, and hereby is, GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Plaintiffs' Complaint be, and hereby is, DISMISSED in its entirety wth prejudice.

Let Judgment be entered accordingly.

---

**33.** As the Court has dismissed the Plaintiffs' claims both procedurally and substantively, it finds no need to examine the question of the adequacy of the pleadings under Fed.R.Civ.P. 9(b).